DA 19-0622

FILED

11/10/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0622

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 284

CODY MEINE, ROBERT MEINE, DOROTHY MEINE,
JERRY MEINE, TAMARA MEINE, RICHARD MEINE,
LINDA MEINE, BOBBIE MUSSARD, RICHARD BLAKE,
and ROBERT BLAKE,

      Plaintiffs and Appellants,

    v.

HREN RANCHES, INC., A Montana Corporation,
JEFF NELSON, RENEE KLAKKEN, MIKE KLAKKEN,
CHERYL HREN, JOHN HREN, BEVERLY HREN,
and JOHN DOES 1-5,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Beaverhead, Cause No. DV-10-13454
Honorable Dan Wilson, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          David L. Vicevich, Amanda D. Hunter, Vicevich Law, Butte, Montana

      For Appellees:

          John F. (Jack) Jenks, Capp, Jenks & Simpson, P.C., Missoula, Montana

          Submitted on Briefs:  May 20, 2020

          Decided:  November 10, 2020

Filed:

                    Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Plaintiffs (the Meines), appeal from the 2019 judgments of the Montana Fifth Judicial District Court, Beaverhead County, interpreting and modifying a prior 2014 judgment that previously adjudicated that they had established various prescriptive easement rights over the subject land before Defendants (the Hrens) acquired it in the mid-1980's. We address the following restated issues:

> *1. Whether the District Court erroneously concluded that M. R. Civ. P. 59-60 did not apply to the Hrens' motions for subsequent interpretation and clarification of the 2014 judgment?*
>
> *2. Whether the District Court erroneously construed the 2014 judgment as ambiguous?*
>
> *3. Whether the District Court erroneously interpreted or clarified the effect of the 2014 judgment inconsistent with its original meaning and effect?*

We reverse and remand for entry of judgment in accordance with this Opinion.

## BACKGROUND

¶2 This appeal arises from the third installment of the ongoing litigation between the Meines and the Hrens regarding disputed prescriptive rights across the Hrens' property on and along the Small Horn Canyon Road (the Road) in Beaverhead County.[1] The Road and involved properties are generally located approximately ten miles south of Dillon, Montana, southwest of Interstate 15, ten miles east of Clark Canyon Reservoir.[2]

---

[1] *See* Diagram 1, *Meine v. Hren Ranches* (*Meine I*), 2015 MT 21, ¶¶ 3-5, 378 Mont. 100, 342 P.3d 22, which is hereby incorporated by reference.

[2] In the 2011 preliminary injunction hearing, Jerry Meine testified to his understanding, based on historical records, that the Road was originally established as a 60' wide county road, continuously fenced on both sides by the adjoining landowners, and thus often used by the public to access

¶3     The Meines represent the current generation of the Meine family who originally homesteaded in Small Horn Canyon in the early 1920's. Various branches of the Meine family have since continually owned the various constituent tracts of the current Meines' property.[3] From its north terminus at the south end of Carriger Lane in Beaverhead County, the Road meanders south to the Bottom Gate location on the north boundary of the Hren property, at the lower end of Small Horn Canyon. It then ascends south to the Corral cattleguard/gate location,[4] and then again south up the canyon to a location at the top of a narrow steep grade, *i.e.*, the Top of the Grade location. From the Top of the Grade, the Road continues south up the canyon to the Rebich Gate location at the south boundary of the Hren property, and then again south through various third-party tracts (*i.e.*, Mussard and Schuett tracts) to the north boundary of the current Meines' property.[5] As of 2014, the

public lands at or accessible from the north end of the canyon. He testified that the Meines began maintaining a lesser road width at some point after the county quit maintaining the Road, but at some point long before 1978. While the 2011-13 evidentiary record indicates that the parties presumed no residual public interest in the Road, the precise legal status of the Road after the county quit maintaining it as a county road is unclear here.

[3] *See Meine I*, ¶ 6, and 2011-13 evidentiary record. As of 2014, the Meines apparently held the current Meine property through a close corporation.

[4] There are two historical gate locations in the vicinity of the Hrens' property corrals—a northerly gate location and a southerly cattleguard/gate location. The southerly location is on and across the Road and is the only one of the two corral area locations at issue here. Reference herein to the Corral location thus exclusively refers to the location of the southerly roadway cattleguard/gate location near the Hrens' property corrals.

[5] As of 2014, from the south boundary of the Hrens' property, the Road continued up the canyon over land owned by Rebich & Sons Livestock Co. and then split, with one fork continuing south on the Rebich property and one continuing into the adjoining Mussard property. The two forks then rejoined on the Schuett property to the south and continued on to the current Meines' property. *Meine I*, ¶ 5. Prior to 1978, before subsequent ownership changes by inheritance, marriage, or other means, the Meine family previously owned significant portions of the Rebich, Schuett, and Mussard properties as indicated on the 2014 diagram. *See Meine I*, ¶¶ 5-6.

3

main segment of the Road terminated further south in the interior of the Meines' property.[6] The original 2011-13 evidentiary record indicates that, prior to 1979, there were wire or chain roadway gates across the Road at various times in the adjacent Hren property fence lines at the Bottom Gate, Corral, and Rebich Gate locations.

¶4 The Hren family first became involved with the Hrens' property in the late 1970's when John Hren began leasing it as ranch range from the Crampton family. The Cramptons had owned the property dating back to the original Crampton family homestead in 1926-27.[7] The Hrens, through John Hren, purchased the property from the Cramptons in the mid-1980's.[8]

¶5 Before the late 1970's, private landowners predominantly used their Small Horn Canyon tracts as a summer livestock range. The Meines and their invitees historically used the Meines' property for that purpose as well as for seasonal hunting, fishing, and other recreational purposes. In the late 1970's, the Meines and the BLM also began using the Road as a logging transportation route necessitated by a large timber blow-down on the adjoining Meines and BLM properties at the south end of the canyon. The Meines also

---

[6] As of 2014, the Road continued south from the Meines property as an unimproved "Jeep Trail" through adjoining tract of private land, ultimately connecting with Federal Bureau of Land Management (BLM) Route 1845. *Meine I*, ¶ 5 n.4.

[7] *Meine I*, ¶ 8.

[8] Unless otherwise indicated in context, general references herein to the "Hrens' property" refer inclusively to the property as originally owned by the Cramptons and subsequently acquired by the Hrens.

thereafter increasingly used the Road for third-party hunting, fishing, and recreational access related to their commercial outfitting and guest ranch operations.

¶6 When the Hrens purchased their property in the mid-1980's, they were fully aware of the Meines' historical and ongoing use of the Road, and immediately adjoining areas, across their property. The Hrens thus did not challenge or attempt to interfere with the Meines' use of the Road until 2007 when the Meines began grading it with heavy equipment through the Hrens' property. The Hrens thereafter attempted to restrict the Meines' use of the road by changing the lock(s) on one or more roadway gates without notice to the Meines and through manipulation of various cattleguards and gate locations.[9] The Meines responded by cutting gate locks, installing their own in-line gate locks, and disabling or removing new gates installed by the Hrens. The Hrens in turn filed "numerous complaints against the Meines with the Beaverhead County Sheriff's Office, alleging trespass and criminal mischief."[10] The first round of the Meine-Hren litigation ensued in 2010 when the Meines filed a district court complaint asserting a prescriptive easement claim, with related requests for preliminary and permanent injunctive relief.

¶7 In 2014, following a 2011 preliminary injunction hearing and two-day bench trial in 2013, the District Court entered findings of fact, conclusions of law, and judgment on

---

[9] *Meine I*, ¶ 14. "The Hrens' actions precipitated a separate lawsuit filed by the Rebiches and Schuett against the Hrens in 2008" that ultimately settled in 2010 when the "parties entered into an agreement . . . establishing reciprocal road easements for the benefit of the Rebich, Schuett, and Hren properties" but which "expressly prohibit[ed] the parties from allowing the Meines to use the easements as 'invitees' of the Rebiches, Schuett, or the Hrens." *Meine I*, ¶ 13.

[10] *Meine I*, ¶ 14.

the Meines' claim based on the combined 2011-13 evidentiary record. The judgment decreed that the Meines had established particularly described prescriptive easement rights over the Hrens' property before the Hrens acquired it. In 2015, we affirmed. *Meines I*, ¶ 49.

¶8 Soon thereafter, the Hrens instituted a separate collateral action against two of the original Meine plaintiffs, later amended to include all of them, seeking declaratory and injunctive relief requiring the Meines to close internal Hrens' property gates and enjoining them from restoring cattleguards and gates as previously authorized under the 2014 judgment.[11] In opposition to the Meines' motion for summary judgment, the Hrens asserted that various legal and factual issues precluded summary judgment, restated in essence, to wit:

(1) whether the Meines had a prescriptive right to leave the roadway Corral and Rebich gates open;[12]

(2) whether § 45-6-101(1)(b) and (d), MCA, required the Meines to close roadway gates at the Corral, Top of the Grade, and Rebich Gate locations;

(3) whether a recently Hrens-installed Top of the Grade roadway gate was a permitted retained use of the servient estate;

(4) whether the Meines had a prescriptive right to leave the new Hrens-installed Gate at the Top of the Grade open; and

(5) which "cattleguards and gates" did the 2014 judgment require the Hrens to restore.

---

[11] *See Hren Ranches, Inc. v. Blake, et al.*, No. DV-15-13831, (Mont. Fifth Judicial Dist., 2015).

[12] This issue is a consolidated restatement of two of the six outstanding issues asserted by the Hrens in opposition to summary judgment.

Agreeing with the Meines, the District Court granted summary judgment in 2016 against the Hrens on the stated ground that res judicata and/or collateral estoppel procedurally barred the Hrens' collateral attack on the 2014 judgment.

¶9 Meanwhile, the dispute continued on the ground, leading to criminal charges against Hren family members in 2016 for criminal mischief, theft, and assault related to their removal of a secondary off-road metal gate installed by the Meines adjacent to the Bottom Gate. The Hrens' continued interference with the Meines' use of the Road and adjoining areas under the 2014 judgment resulted in additional criminal charges against Hren family members in 2017-18. In November 2018, in advance of a pending criminal trial, the Hrens filed a motion in the original civil cause seeking various "interpretations and clarifications" of the 2014 judgment based on alleged ambiguities in the judgment. The Meines procedurally opposed the motion on the asserted ground that the Hrens untimely sought substantive alterations or amendments of the prior judgment precluded by the deadlines specified in M. R. Civ. P. 59-60. They additionally asserted that the law of the case (as established in the 2014 judgment and *Meine I*), as well as res judicata or collateral estoppel based on the 2016 judgment in the collateral action, further precluded litigation of the related issues subsequently raised by the Hrens in 2018. Beyond those procedural objections, they substantively asserted that no interpretation or clarification was necessary because the 2014 judgment was not ambiguous in any event.

¶10 Agreeing with the Hrens, the District Court issued a preliminarily order in 2019 concluding that the 2014 judgment was ambiguous in two regards, thus necessitating the requested interpretation and clarification. The court concluded that M. R. Civ. P. 59-60

7

did not apply because the Hrens sought only interpretation and clarification rather than a substantive amendment or alteration. It further concluded that res judicata and collateral estoppel did not apply because the 2016 judgment in the collateral action was not "a ruling on the merits" of the matters at issue. The court accordingly set the matter for a new evidentiary hearing to aid in the requested interpretation and clarification.

¶11 Later in 2019, after taking new evidence beyond the original evidentiary record, the District Court issued new findings of fact, conclusions of law, and judgment that, in pertinent part, altered or amended the 2014 judgment by:

(1) striking the express provision of the 2014 judgment that required the Hrens to either timely restore "all cattle guards and gates previously installed by [the Meines]" or reimburse the Meines for the same;

(2) decreeing that the Hrens have the right to "remove [or disable] any cattle guard . . . situated within the boundaries of the easement road," thereby eliminating the Meines' asserted need to trail stock off-road around roadway cattleguards;

(3) decreeing that the Hrens had the right to install and maintain roadway gates in lieu of the roadway cattleguards at the pre-2007 locations;

(4) decreeing that the Meines had no prescriptive rights under the 2014 judgment to trail stock outside the specified 20' roadway width or off-road around the preexisting cattleguard locations through secondary off-road stock gates in the adjacent Hrens' property fence lines; and

(5) decreeing that the Meines have a duty to leave the Hrens' property gates open or closed as they find them.

The Meines timely appeal.

## STANDARD OF REVIEW

¶12     We review district court findings of fact only for clear error. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, 53 P.3d 870. We review conclusions and applications of law de novo for correctness. *In re Marriage of Bessette*, 2019 MT 35, ¶ 13, 394 Mont. 262, 434 P.3d 894; *Steer, Inc. v. Mont. Dep't of Revenue*, 245 Mont. 470, 474-75, 803 P.2d 601, 603 (1990). The interpretation or construction of a prior judgment is a question of law reviewed de novo for correctness. *In re Water Rights of Quigley*, 2017 MT 278, ¶ 15, 389 Mont. 283, 405 P.3d 627.

¶13     We review grants or denials of post-judgment relief under M. R. Civ. P. 59-60(b) for an abuse or manifest abuse of discretion, as applicable. *Essex Ins. Co. v. Moose's Saloon, Inc.*, 2007 MT 202, ¶¶ 16-17, 338 Mont. 423, 166 P.3d 451; *Lee v. USAA Cas. Ins. Co.*, 2001 MT 59, ¶ 27, 304 Mont. 356, 22 P.3d 631. An abuse of discretion occurs if a lower court exercises granted discretion based on a clearly erroneous finding of fact, erroneous conclusion or application of law, or otherwise arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice. *Larson v. State*, 2019 MT 28, ¶ 16, 394 Mont. 167, 434 P.3d 241. Whether a lower court abused its discretion is a question of law. *Larson*, ¶ 16.

## DISCUSSION

¶14     *1.     Whether the District Court erroneously concluded that M. R. Civ. P. 59-60 did not apply to the Hrens' motions for subsequent interpretation and clarification of the 2014 judgment?*

¶15     Under M. R. Civ. P. 59, a party may timely move for a new jury or nonjury trial on various specified grounds. M. R. Civ. P. 59(a)(1). Following entry of judgment on a

9

nonjury trial, a party may alternatively move for re-opening of the judgment for additional testimony and amended findings of fact, conclusions of law, and judgment. M. R. Civ. P. 59(a)(2). Under other limited circumstances, a party may also move for alteration or amendment of a judgment without need for additional evidence. *See* M. R. Civ. P. 59(e); *Lee*, ¶¶ 71-72 and 75 (distinguishing Rule 59 motion for a new trial from motion to alter or amend non-trial judgment). Under M. R. Civ. P. 60, an aggrieved party may move for post-judgment relief from final judgment on various other specified grounds, or when otherwise required in fairness or equity under extraordinary circumstances to remedy either a lack of "full presentation of the cause" or an "[in]accurate determination of the merits." M. R. Civ. P. 60(b); *In re Marriage of Orcutt*, 2011 MT 107, ¶¶ 9-11, 360 Mont. 353, 253 P.3d 884.[13]

¶16    In any event, the deadline for seeking Rule 59 relief is no later than "28 days after the entry of judgment." M. R. Civ. P. 59(b) and (e). A party may generally seek Rule 60(b) relief within a time "reasonable" under the particular circumstances at issue, but, in the case of Rule 60(b)(1)-(3) relief, "no more than a year after entry of the judgment." M. R. Civ. P. 60(c)(1). The deadlines for seeking Rule 59-60 relief are mandatory and subject to strict enforcement. *See Green v. Gerber*, 2013 MT 35, ¶ 25, 369 Mont. 20, 303 P.3d 729.

---

[13] However, Rule 59(e) relief is not available to relitigate previously litigated matters, for reconsideration of arguments previously made, or to raise new arguments which a party reasonably could and should have previously made. *Lee,* ¶ 76 (citing *Nelson v. Driscoll*, 285 Mont. 355, 360-61, 948 P.2d 256, 259 (1997)). Rule 60(b) relief is similarly unavailable for such purposes and is further not available as a substitute for appeal. *Orcutt,* ¶ 11.

¶17 Here, the District Court concluded that M. R. Civ. P. 59-60 did not apply to Hrens' 2018 motion for interpretation and clarification based on *Smith v. Foss*, 177 Mont. 443, 582 P.2d 329 (1978). In *Smith*, when a related dispute arose after we had affirmed a 1968 judgment entitling Smith to harvest peat from Foss's property, the district court entered a subsequent judgment in 1974 clarifying that Smith's right to harvest peat from Foss's property applied only to peat consisting of "60% or more of organic material as determined by a heat or ignition test." *Smith*, 177 Mont. at 444, 582 P.2d at 330. When another related dispute arose over the appropriate testing procedure, the court entered a third judgment in 1975 further clarifying the previously described testing method as a particularly specified "ignition method." *Smith*, 177 Mont. at 445, 582 P.2d at 330-31. When yet another dispute arose as to the nature of the requisite test samples, the court issued a fourth judgment in 1977 further specifying that the previously specified testing method required air-dried test samples. *Smith*, 177 Mont. at 445, 582 P.2d at 331.

¶18 Foss appealed on the asserted ground that, regardless of any ambiguity, M. R. Civ. P. 59-60 nonetheless applied and time-barred the requested interpretation or clarification of the 1975 judgment, just like any other motion for subsequent alteration or revision of a prior judgment. *Smith*, 177 Mont. at 446-47, 582 P.2d at 331-32. However, reasoning that the motion for subsequent clarification was merely a motion for incidental relief necessary to fully effect the prior judgment rather than for substantive amendment, we held that M. R. Civ. P. 59-60 did not apply to a mere interpretation or clarification of a prior judgment by the issuing court as necessary to subsequently enforce it or otherwise give it the full effect originally intended. *Smith*, 177 Mont. at 446-47, 582 P.2d at 331-32.

¶19     As manifest in *Smith*, mere interpretation or clarification does not involve or effect a substantive alteration or amendment of the prior judgment—it merely involves interpreting or clarifying its original meaning or effect without material alteration or deviation. *See In re Marriage of Holloway*, 2000 MT 104, ¶¶ 22-23, 299 Mont. 291, 999 P.2d 980 (affirming subsequent clarification of ambiguity in marital dissolution decree as not subject to M. R. Civ. P. 60(b)); *In re Marriage of Rohrich*, 211 Mont. 130, 135, 683 P.2d 1308, 1311 (1984) (interpretation or clarification does not involve "amendment of [original] terms" or "challenge to its validity"—internal citation omitted); *LaPlant v. LaPlant*, 170 Mont. 155, 160, 551 P.2d 1014, 1017 (1976) (interpretation or clarification does not involve substantive amendment of the original effect of the judgment—internal citation omitted); *Kottas v. Kottas*, 164 Mont. 30, 32-34, 518 P.2d 1404, 1405-06 (1974) (distinguishing further declaration or explanation of the original meaning or effect from an "actual modification" governed by M. R. Civ. P. 60(b)).[14] In other words, an interpretation or clarification merely "explains or refines rights already given," but "neither grants new rights nor [expands] old ones." *Kemmer v. Keiski*, 68 P.3d 1138, 1143 (Wash. Ct. App. 2003). In subsequently interpreting or clarifying a prior judgment, the issuing court may more precisely explain or specify the original meaning or effect of the judgment or provide additional specification necessary to implement it. *See Smith*, 177 Mont. at 446-47, 582 P.2d at 331-32; *LaPlant*, 170 Mont. at 159, 551 P.2d at 1016 (referring parties back to

---

[14] *See also Mickey v. Mickey*, 974 A.2d 641, 649 (Conn. 2009) (distinguishing permissible clarification of prior judgment to effectuate original intent from subsequent reconsideration of matters previously litigated or alteration of substantive terms of the original judgment).

issuing court for specification of metes and bound description not referenced in prior decree apportioning the property to one of the parties). Accordingly, we again hold that, by definition, M. R. Civ. P. 59-60 do not apply to a subsequent interpretation or clarification of a prior judgment by the issuing court as necessary to enforce, implement, or otherwise fully effect its manifest original meaning or effect. The District Court thus did not err on that threshold point of procedure.

¶20    *2. Whether the District Court erroneously construed the 2014 judgment as ambiguous?*

¶21    Whether a prior judgment is ambiguous, imprecise, or otherwise uncertain as applied to a subsequent dispute is a question of law. *Water Rights of Quigley*, ¶ 15. As applicable in the context of judgments, the interpretation or construction of a prior judgment is generally subject to the same rules for the interpretation and construction of other written instruments. *Gans & Klein Inv. Co. v. Sanford*, 91 Mont. 512, 522-23, 8 P.2d 808, 811 (1932); *In re Careaga's Estate*, 393 P.2d 415, 417-18 (Cal. 1964). Thus, to the extent possible, courts must construe the meaning and effect of a prior judgment in accordance with its clear and unambiguous operative language, without resort to supporting findings of fact, conclusions of law, the underlying evidentiary record or pleadings, or other extrinsic matters. *Harland v. Anderson Ranch Co.*, 2004 MT 132, ¶ 24, 321 Mont. 338, 92 P.3d 1160; *Quigley v. McIntosh*, 110 Mont. 495, 510, 103 P.2d 1067, 1074 (1940); *Sanford*, 91 Mont. at 523, 8 P.2d at 811. The court must read the subject language in context of the entirety of the operative language of the judgment as a whole, with "effect to every word and part," including "such effects and consequences as follow

by necessary legal implication." *State ex. rel. Foote v. First Jud. Dist. Ct.*, 72 Mont. 374, 379, 233 P. 957, 959 (1925) (internal citation omitted). *See also Lazar v. San Francisco Super. Ct.*, 107 P.2d 249, 251 (Cal. 1940) (judgment "to be . . . construed as a whole to effectuate the obvious intention" of the issuing court).

¶22 However, if the operative language of a judgment is ambiguous, unclear, or imprecise as to a related dispute that subsequently arises between the parties, a court may then construe it in accordance with its supporting conclusions of law, findings of fact, and underlying evidentiary record and related pleadings. *Harland*, ¶ 24; *McIntosh*, 110 Mont. at 510-11, 103 P.2d at 1074; *Cocanougher v. Montana Life Ins. Co.*, 103 Mont. 536, 543-44, 64 P.2d 845, 848 (1936).[15] To the extent possible, the court must reasonably construe the ambiguity, uncertainty, or imprecision in harmony with the underlying evidentiary record and applicable law. *Water Rights of Quigley*, ¶ 15; *Harland*, ¶ 23; *Sanford*, 91 Mont. at 522-23, 8 P.2d at 811. Like other written instruments, a judgment is ambiguous only if susceptible to more than one objectively reasonable meaning or effect when read in the context of the entirety of its operative language, with effect to all. *See Montana Petroleum Tank Release Comp. Bd. v. Crumleys, Inc.*, 2008 MT 2, ¶ 34, 341 Mont. 33, 174 P.3d 948 (citing *Jacobsen v. Farmers Union Mut. Ins. Co.*, 2004 MT 72, ¶ 19, 320 Mont. 375, 87 P.3d 995, *overruled on other grounds by Allstate Ins. Co. v.*

---

[15] *See also Watson v. Lawson*, 135 P. 961, 963-64 (Cal. 1913) (court may interpret or clarify uncertain judgment by reference to the underlying findings of fact, evidence, and pleadings upon which the judgment was based and in accordance with the applicable law governing the matter at issue).

14

*Wagner-Ellsworth*, 2008 MT 240, ¶¶ 39-40, 344 Mont. 445, 188 P.3d 1042); *Performance Mach. Co. v. Yellowstone Mtn. Club*, 2007 MT 250, ¶ 39, 339 Mont. 259, 169 P.3d 394.

¶23 Here, the District Court concluded in its preliminary 2019 judgment that the 2014 judgment was ambiguous in two material regards. It first concluded that the express provision of the judgment requiring the Hrens to restore "all cattle guards and gates previously installed by [the Meines]" was ambiguous based on the Hrens' assertion that the evidence "would demonstrate that none of the gates and cattle guards at issue were installed by [the Meines]," but were "instead . . . installed by the [BLM]." However, mere disagreement or dispute over the correct interpretation of a written instrument, or a party assertion of an ambiguity, is insufficient alone to render an instrument ambiguous. *Richards v. JTL Grp., Inc.*, 2009 MT 173, ¶ 26, 350 Mont. 516, 212 P.3d 264 (citing *Creveling v. Ingold*, 2006 MT 57, ¶ 8, 331 Mont. 322, 132 P.3d 531, and *Mary J. Baker Revocable Tr. v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶ 70, 338 Mont. 41, 164 P.3d 851). An instrument is ambiguous only if ambiguous in meaning or effect. Thus, contrary to the District Court's reasoning, the Hrens' mere assertion was insufficient alone to render the 2014 judgment ambiguous.

¶24 Moreover, whether the Hrens were seeking to relitigate the effect of the original evidence contrary to the pertinent findings of fact made by the court in 2014, or merely seeking interpretation or clarification as alleged, neither the District Court's reasoning, nor the Hrens' assertions on appeal, demonstrate or explain how, or on what basis, the operative language of the 2014 judgment is reasonably subject to two different meanings or effects. While a separate ground for subsequent interpretation or clarification, mere imprecision or

15

uncertainty in the meaning or effect of a judgment does not render it ambiguous. *See Worldwide Underwriters Ins. Co. v. Brady*, 973 F.2d 192, 195 (3d Cir. 1992) (applying similar principle to contract interpretation). The District Court thus erroneously concluded that Hrens' evidentiary assertion rendered the 2014 judgment ambiguous.

¶25 As the second justification for interpretation or clarification, the District Court further concluded that, in light of an earlier preliminary injunction provision compelling the Meines to "leave the gates open or closed" as found, the 2014 judgment was also "ambiguously silent concerning [their] ongoing obligation to close various gates situated on or over the prescriptive easement." While the language of the 2014 judgment did not expressly specify whether it required the Meines to leave authorized Hrens' property gates open or closed as found, the District Court's reasoning again failed to demonstrate how that omission rendered any aspect of the 2014 judgment reasonably suspect to more than one meaning or effect.

¶26 Further, except as otherwise expressly continued or provided as a permanent injunction in the ensuing final judgment, a preliminary injunction is merely a provisional remedy that terminates and is superseded by the final judgment on the merits of the underlying claim(s). *Wright v. Westside Nursery*, 787 P.2d 508, 516 (Utah Ct. App. 1990); *Shahen v. San Bernardino Cty. Super. Ct.*, 115 P.2d 516, 517 (Cal. Ct. App. 1941) (citing *People's Ditch Co. v. Foothill Irr. Dist.*, 284 P. 514, 515-16 (Cal. Ct. App. 1930)); *Jackson v. Bunnell*, 21 N.E. 79, 80 (N.Y. 1889). *See also Yockey v. Kearns Properties, LLC*, 2005 MT 27, ¶ 18, 326 Mont. 28, 106 P.3d 1185 ("limited function of a preliminary injunction is to preserve the *status quo* and to minimize the harm to all parties pending full trial"—

16

emphasis in original). Thus, any conflict, ambiguity, or inconsistency between a final judgment and a provision of a preliminary injunction not expressly continued or re-imposed as a permanent injunction does not and, by lapse, cannot render the final judgment ambiguous, unclear, or imprecise in meaning or effect. We hold that the District Court erroneously concluded that the 2014 judgment was ambiguous in meaning or effect.

¶27 *3. Whether the District Court erroneously interpreted or clarified the effect of the 2014 judgment inconsistent with its original meaning and effect?*

¶28 As noted by the District Court, the Hrens asserted that interpretation or clarification of the 2014 judgment was necessary to resolve ongoing disputes between the parties as to its meaning and effect regarding the following restated issues:

(1) which "cattle guards and gates" did the judgment require the Hrens reinstall or leave in place, if any;

(2) whether the Meines' prescriptive rights included the right to install and maintain a secondary off-roadway gate adjacent to the Bottom Gate;

(3) whether the scope of Meines' prescriptive easement precluded the Hrens from removing or disabling preexisting cattle guards at the disputed locations;

(4) whether the scope of Meines' prescriptive easement precluded the Hrens from installing and maintaining a gate on the Road at the Top of the Grade location; and

(5) whether the judgment required the Meines to leave authorized gates on the Hrens' property open or closed as found.

We agree, but on the basis of imprecision or uncertainty rather than ambiguity.

¶29 In pertinent part, based on its underlying findings of fact and conclusions of law, the operative language of the 2014 judgment decreed that:

17

(1)     the Meines acquired an appurtenant prescriptive roadway and incidental use easement "across, over[,] and through" the Hrens' property on and along the Road as described;

(2)     the described scope of the Meines' established prescriptive use was "*limited only by historical scope*";

(3)     the easement generally runs through Hrens' property "on each side of the centerline" of the Road, as specifically described by the referenced exhibit;

(4)     "the maximum *road top* surface shall be twenty foot (20') wide" and the Meines "shall use reasonable efforts to trail livestock [there]on," but "[l]ivestock and herders who follow the path of least resistance *in reasonable proximity* to the easement do not trespass";

(5)     "all cattle guards and gates previously installed by [the Meines] shall be restored by [the Hrens] to condition as good or better than prior to 2007 no later than October 15, 2014 . . . [If not,] [the Meines] may restore the gates and cattle guards in accord with this judgment at [the Hrens'] expense"; and

(6)     "should [the Hrens] choose to lock any gate across [the Road] as it enters or leaves their property, they shall immediately provide keys to" the Meines.

(Emphasis added.)  The judgment further specified that the established prescriptive rights included three additional off-road incidents not currently at issue.  It decreed that the prescriptive easement included all necessary "lateral and subjacent support for the road at all points" and "the right to maintain the [Road] as it passes through [the Hrens'] land[,] suitable for the purposes" described "including semi-truck traffic," with "such additional width as may[ ]be reasonably necessary for maintenance in accord with historical use and practice."  It additionally decreed that the easement included the Meines' "right to park vehicles, unload cattle, load cattle, and turn vehicles around[,] including semi-trucks[,] consistent with their historic use in [a precisely defined 120' x 200'] area . . . [n]orth of the

18

[Hrens'] corrals." The judgment then ultimately "permanently enjoined [the Hrens] from blocking or impairing the [described] easement across [their] property."

(A) Historical Roadway and Off-Road Use, Cattleguards, and Secondary Gates

¶30 As in its preliminary 2019 order, the District Court similarly concluded in its final 2019 order that the 2014 judgment was ambiguous insofar that it required the Meines to trail cattle only on the roadway while at the same time requiring the Hrens to restore and not interfere with roadway cattleguards that existed prior to 2007. The court concluded that those provisions were irreconcilably ambiguous in light of the manifest purpose of cattleguards and its interpretation that the "language of the [j]udgment . . . does not grant the Meines the right to drive cattle through [secondary] gates or gate openings which are not positioned over the easement road[way]."

¶31 However, as a threshold matter, the operative language of the 2014 judgment clearly decreed that the established scope of the Meines' prescriptive right over and across the Hrens' property was "limited only by [the] historical scope" of their established prescriptive use of the property. While specifying that the subject easement generally ran through Hrens' property "on each side of the [existing roadway] centerline" with a maximum width of 20', the specified 20' width expressly applied only to the "road top surface" (*i.e.* the established width of the roadway). The express specification of a 20' "road top surface" width thus did not in and of itself preclude or limit other incidental prescriptive off-roadway uses expressly referenced or manifestly implied in the language of the judgment and underlying findings of fact and conclusions of law.

19

¶32    Beginning with its operative language, the judgment expressly decreed in pertinent part that:

> [T]he maximum *road top surface* shall be twenty foot (20') wide. [The Meines] shall use reasonable efforts to trail livestock on the easement. Livestock and herders who follow the path of least resistance *in close proximity* to the easement *do not trespass*.

(Emphasis added.) While not as explicitly as it could have, the judgment language clearly referenced a limited right to trail cattle beyond the specified 20' width in "close proximity" thereto. The judgment further expressly decreed that:

> [A]ll *cattle guards and gates previously installed* by [the Meines] shall be restored by [the Hrens] to condition as good or better than *prior to 2007* no later than October 15, 2014.

(Emphasis added.) Based on the fact, as noted by the District Court, that the purpose of cattle guards is to deter livestock from crossing through roadway openings in fence lines, the judgment language at least implied an included prescriptive right to trail cattle off-road around required cattleguard locations. Express references in the supporting findings of fact and conclusions of law further manifest the original effect and intent to adjudicate that the Meines' prescriptive rights included the incidental right to trail stock beyond the specified 20' roadway width and around the pre-2007 roadway cattleguard locations, to wit:

> [T]he road was constructed to its current condition in 1979 . . . includ[ing] installation of cattle guards on what is now Hrens' property so that cattle could be controlled without requiring vehicles to stop to open gates.

.   .   .

> Trailed livestock do not walk in a straight line or observe arbitrary width limitations. Livestock travel along a general route on the path of least resistance.

20

. . .

> [The Meines] . . . have the right to use of a road no more than twenty feet wide *together with . . . sufficient width to continue historic . . . use by trailed livestock.*

. . .

> When the [Meines] use the road to move livestock they should use their best efforts to keep to the *general route of the road.* Livestock straying incidentally en route beyond the road is *not a trespass*.

. . .

> [The Meines] are entitled to trail stock along the *general route* of the road . . . [and] should endeavor to *avoid excessive departure* from the actual route.

. . .

> All [Meines'] *cattle guards and gates removed by* [*the Hrens*] should be restored to their pre-2007 condition or better by [the Hrens].

(Emphasis added.)

¶33    In addition to and consistent with the manifest provision and implication of the above-noted references in the express references of the judgment and supporting findings and conclusions, it was beyond genuine material dispute on the underlying 2011-13 evidentiary record that, prior to 2007 when the Hrens first started to interfere with the Meines' historical use of the roadway and adjoining areas, the BLM and Robert Meine cooperated to effect the installation of roadway cattleguards, and secondary off-road stock gates in adjacent Hrens' property fence lines, at the Bottom Gate, Corral, Top of Grade, and Rebich Gate locations. The original evidentiary record further indicates that the cattleguards and secondary off-road stock gates were in place and use adverse to the Hren

21

property ownership from 1979 until sometime into 2007, after which the Hrens removed the roadway cattleguards from the Bottom Gate and Corral locations, as well as the secondary off-road stock gate adjacent to the Bottom Gate.

¶34 Thus, construed in harmony, the operative judgment language, supporting findings of fact and conclusions of law, and the underlying evidentiary record manifest that the adjudicated "historical scope" of the Meines' established prescriptive use *inter alia* included: (1) use of the specified 20' roadway for stock trailing as well as vehicular, animal, and foot travel; (2) trailing stock beyond the specified 20' roadway width, "in reasonable proximity" thereto, upon reasonable efforts to keep stock on the roadway; (3) having and maintaining roadway cattle guards in their pre-2007 locations at the Bottom Gate, Corral, Top of Grade, and Rebich Gate locations; and (4) having and maintaining secondary off-road stock gates, as installed or existing prior to 2007, in the adjacent Hrens' property fence lines for trailing stock off-road around the roadway cattle guards at those locations. However, by necessary implication from the limited nature of the 2014 judgment, and underlying evidentiary record, findings of fact, and conclusions of law, the Meines' prescriptive use of the secondary off-road stock gates did not include use of those gates for any purpose other than stock trailing or maintenance of those gates or the adjacent roadway cattleguards.[16]

---

[16] A Meine family member testified at the 2019 hearing that the Meines also needed and used the off-road secondary gates for non-trailing-related vehicular traffic in the winter to avoid having to walk over icy cattleguards to open over-cattleguard roadway gates. However, the original 2011-13 evidentiary record includes no indication of any such continuous adverse use during any prescriptive period. Nor is there any corresponding language in the resulting 2014 findings of fact, conclusions of law, or judgment implying such a finding or adjudication.

(B)  Hrens' Duty to Restore Pre-2007 Cattle Guards and Secondary Stock Gates

¶35    The Hrens correctly point out that neither the 2014 judgment language, nor supporting findings and conclusions, specifically identify which "cattle guards and gates" the judgment language required them to restore.  However, the underlying findings of fact and conclusions of law nonetheless do clearly indicate that the judgment reference to "all cattle guards and gates previously installed by [the Meines]" referred to the two cattleguards and any gates removed by the Hrens in or after 2007, to wit:

> [T]he road was constructed to its current condition in 1979 . . . includ[ing] installation of cattle guards . . . so that cattle could be controlled without requiring vehicles to stop to open gates . . . [The *Hrens*] *removed two* cattle guards . . . *that were installed in 1979*.
>
> .    .    .
>
> *All* [of the Meines'] cattle guards and gates *removed by* [*the Hrens*] should be restored to their pre-2007 condition or better by [the Hrens].

(Emphasis added.)  It was further beyond genuine material dispute on the original 2011-13 record that, sometime in or after 2007, the Hrens removed the roadway cattleguards from the Bottom Gate and Corral locations, as well as the secondary off-road stock gate in the adjacent Hrens' property fence line at the Bottom Gate location.  The 2014 judgment thus required the Hrens to timely restore the roadway cattleguards that were in place at the Bottom Gate and Corral locations prior to 2007, as well as the secondary off-road stock gate that was in place prior to 2007 in the adjacent Hrens' property fence line at the Bottom Gate location.

(C)  <u>Roadway Gates and Locks</u>

¶36    As expressly or implicitly reflected in various provisions of the 2014 findings of fact, conclusions of law, and judgment, it was beyond genuine material dispute on the 2011-13 evidentiary record that wire or chain roadway gates existed at the Bottom Gate, Corral, Top of Grade, and Rebich Gate locations at various times prior to 1979.  It was further beyond genuine material dispute that, regardless of who performed the actual installations, the cooperative efforts of the BLM and Robert Meine resulted in the 1979 replacement of those roadway gates with roadway cattleguards and the related installation, maintenance, and use of secondary off-road stock gates in the adjacent Hrens' property fence lines.  It was likewise beyond genuine dispute, as reflected in the 2014 judgment and underlying findings and conclusions, that the Road was thereafter open and continuously used by the Meines for unrestricted roadway vehicular travel between the Bottom Gate and Rebich Gate until the Hrens began interfering with that historical use in 2007.  However, consistent with the 2011-13 evidentiary record, the 2014 judgment decreed that the Meines' prescriptive rights were nonetheless subject to the retained right of the servient estate owner(s) to install or maintain some type of roadway gate at the historical Bottom Gate and Rebich Gate locations (*i.e.* Hrens' property boundary gate locations), and to lock them upon the provision of the necessary key(s) to the Meines.  Thus, the Meines' prescriptive rights under the 2014 judgment included, *inter alia*, unrestricted vehicular access on the specified 20' width of the Road across the Hrens' property, but subject only to the retained rights of the Hrens to install or maintain roadway gates at the Bottom Gate and Rebich Gate locations (*i.e.*, boundary gate locations), and to lock them, and the adjacent secondary

off-road stock gates, at their discretion upon immediate provision of the necessary key(s) to the Meines.

¶37 Consistent with the Meines' established unrestricted vehicular roadway access between the Bottom Gate and Rebich Gate locations between 1979 and 2007, it is further beyond genuine material dispute on the 2011-13 and 2019 evidentiary records that no roadway gate existed at or near the Top of the Grade location between 1979 and 2014, until first installed by the Hrens after entry of the 2014 judgment. While an owner generally retains the right to use a servient estate for any reasonable purpose not inconsistent with the easement rights of a dominate estate owner, a servient estate owner has no retained right to place a gate across a roadway easement if the gate will be inconsistent or interfere with a granted, reserved, or established prescriptive use. *See* § 70-17-106, MCA (extent of prescriptive easement "determined by the terms of . . . the nature of the enjoyment by which it was acquired"); *O'Keefe v. Mustang Ranches HOA*, 2019 MT 179, ¶¶ 33-34, 396 Mont. 454, 446 P.3d 509; *Mason v. Garrison*, 2000 MT 78, ¶ 47, 299 Mont. 142, 998 P.2d 531; *Tungsten Holdings, Inc. v. Kimberlin*, 2000 MT 24, ¶ 40, 298 Mont. 176, 994 P.2d 1114, *overruled on other grounds by Shammel v. Canyon Res. Corp.*, 2003 MT 372, ¶ 12 n.2, 319 Mont. 132, 82 P.3d 912; *Gabriel v. Wood*, 261 Mont. 170, 177-78, 862 P.2d 42, 446-57 (1993), *overruled on other grounds by Shammel*, ¶ 12 n.2.

¶38 Here, the 2014 judgment decreed that the described prescriptive uses of the 20' roadway and adjoining off-road areas established by the Meines were "limited only by historical scope." As expressly found and concluded in the 2014 judgment, the Meines' historical prescriptive use of the Hrens' property roadway was continuous, uninterrupted,

25

and unrestricted after 1979 except by roadway gates at the Bottom Gate and Rebich Gate locations at the Hrens' property boundaries. The 2014 findings of fact and underlying evidentiary record clearly indicate that the Meines at no time accepted or acquiesced to the Hrens' attempts to limit, control, or otherwise interfere with their historical prescriptive use of the Hrens' property. Thus, by necessary implication, the 2014 judgment precluded any retained right or subsequent attempt by the Hrens to install or maintain a roadway gate at the Top of the Grade location, or any other roadway location where none existed between 1979 and 2007.

(D) <u>Summary -- Application to Ongoing Post-2014 Meine-Hren Disputes</u>

¶39 Based on the foregoing interpretive analysis and as pertinent to the ongoing disputes at issue, we hold that the prescriptive easement rights decreed in favor of the Meines in the 2014 judgment included, *inter alia*, the rights to:

(1) use the described 20' wide roadway for stock trailing and vehicular, animal, and foot travel related to the described historical uses;

(2) use the adjoining off-road area along the described 20' roadway for trailing stock, in as close proximity to the 20' roadway as reasonably possible upon reasonable efforts to keep stock on the roadway;

(3) have and maintain cattle guards in the pre-2007 locations at the Bottom Gate, Corral, Top of Grade, and Rebich Gate locations;

(4) have and maintain secondary off-road stock gates, as installed or existing prior to 2007, in the adjacent Hren property fence lines for trailing stock off-road around the roadway cattle guards at those locations.

The referenced "cattle guards and gates" the 2014 judgment required the Hrens to timely reinstall to pre-2007 condition or better were the roadway cattleguards that existed at the

26

Bottom Gate and Corral locations prior to 2007, and the secondary off-road stock gate that existed in the fence line adjacent to the Bottom Gate location prior to 2007. However, in accordance with the express limiting language of the 2014 judgment, and lack of supporting evidence on the 2011-13 evidentiary record, the Meines' prescriptive right to have, use, and maintain secondary off-road stock gates at the above-described locations did not include the right to use them for any purpose unrelated to the immediate trailing of stock or the necessary maintenance of those gates and/or the adjacent roadway cattle guards.

¶40    By similar implication from the limited scope of the Meines' adjudicated prescriptive rights, the servient estate owner(s) retained the right to have and maintain roadway gates at the Bottom Gate and Rebich Gate locations to secure the Hrens' property boundaries, but no right to install or maintain a roadway gate across the Road at or near the Top of the Grade location, or any other location where none existed between 1979 and 2007. As expressly provided in the 2014 judgment, the retained servient estate rights also included the right to lock the authorized roadway and adjacent off-road stock gates at the Bottom Gate and Rebich Gate locations, upon immediate provision of the necessary key(s) to the Meines. By implication from the retained servient estate rights, the Meines have an implied duty under the 2014 judgment to leave the roadway gates at the Bottom Gate and Rebich Gate locations, as well as all authorized off-road stock gates adjacent to authorized roadway cattleguards, open or closed as found.

27

**CONCLUSION**

¶41    While it correctly concluded the M. R. Civ. P. 59-60 did not apply to the Hrens' 2018 motion for interpretation and clarification, the District Court erroneously concluded that the 2014 judgment was ambiguous on its face or in effect.  However, the judgment, and supporting findings and conclusions, were nonetheless imprecise or uncertain in various regards, leaving significant fodder for ongoing dispute and thus warranting subsequent interpretation and clarification.  But the court ultimately misinterpreted the judgment and, in doing so, erroneously altered and amended its substance inconsistent with its manifestly intended original meaning and effect.  We therefore reverse the 2019 judgments of the District Court and remand for entry of an amended judgment in conformance with this Opinion.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON