FILED

10/09/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0287

DA 23-0287

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 228

PLANNED PARENTHOOD OF MONTANA;
ALL FAMILIES HEALTHCARE; BLUE
MOUNTAIN CLINIC; SAMUEL DICKMAN, M.D.,
and HELEN WEEMS, APRN-FNP, on behalf of
themselves and their patients,

        Plaintiffs and Appellees,

   v.

STATE OF MONTANA; MONTANA DEPARTMENT
OF PUBLIC HEALTH AND HUMAN SERVICES; and
CHARLIE BRERETON, in his official capacity as Director
of the Department of Public Health and Human Services,

        Defendants and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                      In and For the County of Lewis and Clark, Cause No. ADV-2023-299
                      Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Austin Knudsen, Montana Attorney General, Michael D. Russell, Thane
           Johnson, Alwyn Lansing, Michael Noonan, Assistant Attorneys General,
           Helena, Montana

           Emily Jones, Special Assistant Attorney General, Jones Law Firm, PLLC,
           Billings, Montana

      For Appellees Planned Parenthood of Montana and Samuel Dickman, MD:

           Raph Graybill, Graybill Law Firm, Great Falls, Montana

           Tanis M. Holm, Edmiston & Colton Law Firm, Billings, Montana

           Peter Im, Planned Parenthood Federation of America, Inc., Washington,
           District of Columbia

Dylan Cowit, Planned Parenthood Federation of America, Inc., New York, New York

For Appellees All Families Healthcare, Blue Mountain Clinic, and Helen Weems:

Alex Rate, ACLU of Montana, Missoula, Montana

Erin M. Erickson, Bohyer, Erickson, Beaudette, and Tranel P.C., Missoula, Montana

Hillary Schneller, Jen Samantha D. Rasay, Center for Reproductive Rights, New York, New York

For Amicus National Health Law Program:

Michael G. Black, Attorney at Law, Helena, Montana

For Amici National Association of Nurse Practitioners in Women's Health, American College of Nurse-Midwives, American Academy of Physician Associates, and Association of Physician Associates in Obstetrics and Gynecology:

Lindsay C. Beck, Attorney at Law, Bozeman, Montana

Jonathan K. Youngwood, Simpson Thacher & Bartlett LLP, New York, New York

Simona G. Strauss, Simpson Thacher & Bartlett LLP, Palo Alto, California

For Amici American College of Obstetricians and Gynecologists, Society for Maternal-Fetal Medicine, and Society of Family Planning:

Rylee Sommers-Flanagan, Dimitrios Tsolakidis, Mikaela Koski, Upper Seven Law, Helena, Montana

Nicole A. Saharsky, Mayer Brown LLP, Washington, District of Columbia

For Amici Legal Voice, Montana Coalition Against Domestic & Sexual Violence, Asian Pacific Institute on Gender-Based Violence, Coalition Ending Gender-Based Violence, The National Domestic Violence Hotline, and Sexual Violence Law Center:

Matthew Gordon, Perkins Coie LLP, Seattle, Washington

Submitted on Briefs: May 8, 2024
Decided: October 9, 2024

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     Defendants and Appellants the State of Montana, the Montana Department of Public Health & Human Services (DPHHS), and Charlie Brereton, in his official capacity as Director of DPHHS (collectively, "the State") appeal from the preliminary injunction issued by the First Judicial District Court, Lewis and Clark County. The District Court's preliminary injunction enjoined two laws regarding Medicaid funding of abortions—HB 544 and HB 862—passed by the Montana Legislature during the 2023 session, as well as a rule adopted by DPHHS amending Admin. R. M. 37.82.102 and 37.86.104 (2023) (the Rule).

¶2     We address the following restated issue on appeal:

*Whether the District Court manifestly abused its discretion by granting a preliminary injunction which enjoined HB 544, HB 862, and the Rule.*

¶3     We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     During the 2023 legislative session, the Montana Legislature passed several abortion-related bills. Among those bills were two related to the Medicaid funding of abortions in Montana—HB 544 and HB 862. Along with those bills from the Legislature, DPHHS proposed and adopted the Rule, which also addresses Medicaid funding of abortions.

¶5     Title XIX of the Social Security Act provides for grants to states for medical assistance programs, known as Medicaid, with the stated objective of "enabling each State, as far as practicable under the conditions in such State, to furnish . . . medical assistance

3

on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services . . . ." 42 U.S.C. § 1396-1. State participation in the Medicaid program is voluntary. *Bailey v. Mont. Dep't of Pub. Health and Hum. Servs.*, 2015 MT 37, ¶ 8, 378 Mont. 162, 343 P.3d 170. Montana is a Medicaid participant, and the Montana Medicaid program is administered by DPHHS. Section 53-6-101(1), MCA. On December 23, 2022, DPHHS published the proposed amendments of Admin. R. M. 37.82.102 and 37.86.104 in the Montana Administrative Register (MAR) in MAR Notice No. 37-1024. The Rule proposed to amend the Administrative Rules governing the Montana Medicaid program to bar abortion coverage provided by a provider other than a physician, excluding advance practice clinicians (APCs) such as physician assistants (PAs) and advanced practiced registered nurses (APRNs); require abortion services to undergo a prior authorization process; and provides an abortion-specific definition of "medically necessary," which allows coverage under Medicaid only when:

> (a) a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed; or
>
> (b) although it does not place the woman in danger of death unless an abortion is performed, a woman suffers from:
>
> (i) a physical condition that would, as certified by a physician, be significantly aggravated by the pregnancy; or
> (ii) a psychological condition that would, as certified by a physician, be significantly aggravated by the pregnancy.

4

This abortion-specific definition of the Rule modifies the Admin. R. M. 37.82.102(18)(a) definition of "[m]edically necessary service" which applies generally to all medical care:

> [A] service or item reimbursable under the Montana Medicaid program, as provided in these rules . . . [w]hich is reasonably calculated to prevent, diagnose, correct, cure, alleviate, or prevent the worsening of conditions in a patient which:
>
> > (i) endanger life;
> >
> > (ii) cause suffering or pain;
> >
> > (iii) result in illness or infirmity;
> >
> > (iv) threaten to cause or aggravate a handicap; or
> >
> > (v) cause physical deformity or malfunction.

DPHHS adopted the Rule as proposed on April 28, 2023, with an effective date of May 1, 2023.

¶6    HB 544 is similar to the Rule and bars Medicaid from covering abortion services provided by a provider other than a physician, excluding APCs; requires abortion services to undergo a prior authorization process; and provides an abortion-specific definition of "medically necessary" which allows coverage only when a physician certifies that a patient "suffers from: (a) a physical condition that would be significantly aggravated by the pregnancy; or (b) a severe mental illness or intellectual disability that would be significantly aggravated by the pregnancy."  HB 862, meanwhile, prohibits the use of public funds for abortion services unless the pregnancy is "the result of an act of rape or incest" or would place the patient "in danger of death[.]"

¶7     On April 28, 2023, Planned Parenthood of Montana (PPMT); All Families Healthcare; Blue Mountain Clinic; Dr. Samuel Dickman, M.D., PPMT's chief medical officer; and Helen Weems, APRN-FNP, the owner and sole clinician of All Families Healthcare (collectively "Providers") filed a Verified Complaint and Petition for Declaratory Relief, Permanent Injunction, Preliminary Injunction, and Temporary Restraining Order in the District Court, seeking to enjoin the Rule as unconstitutional.  On May 1, 2023, the District Court issued a TRO enjoining the Rule until such time as the court could rule on the Providers' application for a preliminary injunction.  The District Court initially set a hearing for May 12, which was later continued until May 23.  The governor signed HB 544 on May 15 and HB 862 on May 16.  Both bills were set to take effect on July 1, 2023.  On May 18, 2023, Providers filed a verified amended complaint, adding additional claims asserting HB 544 and HB 862 were unconstitutional.  That same day, Providers sought preliminary injunctions against HB 544 and HB 862.  Prior to the May 23, 2023 hearing, the parties filed a joint stipulation regarding the hearing, which had been combined with a preliminary injunction hearing in Lewis and Clark County District Court Cause No. ADV-23-231.[1]  Among other things, the stipulation provided that testimony taken at the hearing regarding either case could be relied upon by the parties or

---

[1] This cause dealt with challenges to bills related to a requirement mandating an ultrasound prior to an abortion and the prohibition and criminalization of the D&E abortion procedure.  The District Court issued a preliminary injunction in Cause No. ADV-23-231, which the State appealed to this Court.  In an opinion issued contemporaneously with the opinion in this case, we upheld the District Court's grant of a preliminary injunction. *Planned Parenthood of Mont. v. State ex rel. Knudsen*, 2024 MT 227, ___ Mont. ___, ___ P.3d ___.

the District Court in the other case and that the parties, for the purposes of the preliminary injunction hearing(s) only, stipulated to the qualifications of each other's medical experts.

¶8     The District Court held the preliminary injunction hearing on May 23, 2023.  At the hearing, the court heard testimony of Dr. Dickman; Helen Weems, APRN-FNP; State Medicaid Director Michael Randol; Dr. George Mulcaire-Jones; Nicole Smith, the Executive Director of Blue Mountain Clinic; and Dr. Steven Ralston.  At the close of the hearing, the District Court orally granted the Providers' request for a preliminary injunction.  The court noted it was considering the recently-revised preliminary injunction standard, stated its belief that "the purpose of an injunction is to maintain the status quo," and granted the requested preliminary injunction of HB 544 and HB 862 after "considering the testimony, the evidence presented today and the arguments of counsel" presented at the hearing.  The District Court also informed the parties it was "not sure how quickly" it would be able to issue the written orders for each of the cases covered at the hearing.

¶9     On May 24, 2023, the State filed a notice of appeal to this Court.  The District Court issued its written order granting the Providers' request for a preliminary injunction on July 11, 2023.  Additional facts will be discussed as necessary below.

## STANDARD OF REVIEW

¶10    "An order granting an injunction is immediately appealable, notwithstanding the fact that the merits of the controversy remain to be determined." *Sandrock v. DeTienne*, 2010 MT 237, ¶ 12, 358 Mont. 175, 243 P.3d 1123 (citing M. R. App. P. 6(3)(e)).  We review a district court's grant of a preliminary injunction for a manifest abuse of discretion. *Planned Parenthood of Mont. v. State ex rel. Knudsen*, 2022 MT 157, ¶ 5, 409 Mont. 378,

7

515 P.3d 301. "An abuse of discretion occurs if a lower court exercises granted discretion based on a clearly erroneous finding of fact, erroneous conclusion or application of law, or otherwise arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *Meine v. Hren Ranches, Inc.*, 2020 MT 284, ¶ 13, 402 Mont. 92, 475 P.3d 748. A manifest abuse of discretion is one which is obvious, evident, or unmistakable. *Est. of Mandich v. French*, 2022 MT 88, ¶ 16, 408 Mont. 296, 509 P.3d 6. "The grant or denial of injunctive relief is a matter within the broad discretion of the district court based on applicable findings of fact and conclusions of law." *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73. To the extent the district court's ruling is based on legal conclusions, we review the district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Weems v. State ex rel. Fox*, 2019 MT 98, ¶ 7, 395 Mont. 350, 440 P.3d 4 (*Weems I*) (citation omitted).

## DISCUSSION

¶11 *Whether the District Court manifestly abused its discretion by granting a preliminary injunction which enjoined HB 544, HB 862, and the Rule.*

¶12 On March 2, 2023, the Legislature amended Montana's preliminary injunction statute. 2023 Mont. Laws ch. 43, § 1. While under the previous statute, a party seeking a preliminary injunction was able to obtain a preliminary injunction "by demonstrating the criteria of one of its five subsections," *Driscoll v. Stapleton*, 2020 MT 247, ¶ 13, 401 Mont. 405, 473 P.3d 386, a party seeking a preliminary injunction since March 2, 2023, is now required to meet the amended statute's four-part conjunctive test:

> A preliminary injunction order or temporary restraining order may be granted when the applicant establishes that:

8

(a) the applicant is likely to succeed on the merits;

(b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief;

(c) the balance of equities tips in the applicant's favor; and

(d) the order is in the public interest.

Section 27-19-201(1), MCA. The Providers sought a preliminary injunction to enjoin HB 544, HB 862, and the Rule after the amendments to the preliminary injunction statute took effect and the preliminary injunction hearing in this case took place on May 23, 2023. Accordingly, their request for a preliminary injunction is subject to the four-part conjunctive test of the amended § 27-19-201(1), MCA.

¶13 The Legislature amended Montana's preliminary injunction law with the intent to "mirror the federal preliminary injunction standard[.]" Section 27-19-201(4), MCA (2023). The basic federal standard comes from the U.S. Supreme Court's decision in *Winter v. NRDC, Inc.*, 555 U.S. 7, 129 S. Ct. 365 (2008), and requires that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20, 129 S. Ct. at 374. The Ninth Circuit, along with several other circuit courts, has determined the *Winter* test did not eliminate the discretion of a district court judge to preserve the status quo with provisional relief until the merits could be sorted out in cases where clear irreparable injury would otherwise result and at least serious questions going to the merits are raised. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir.

2011) (citation omitted). "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third *Winter* factors are satisfied." *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *All. for the Wild Rockies*, 632 F.3d at 1134-35).

¶14    In the federal system, appellate review of a district court's grant of injunctive relief is meant to be "limited and deferential." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1184 (9th Cir. 2024). In accordance with this deferential standard, appellate review of an order granting a preliminary injunction "does not extend to the underlying merits of the case." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citation omitted). In general, "as long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Farris*, 677 F.3d at 864 (cleaned up). While Justice Rice's Dissent pays lip service to following federal precedent regarding appellate review of preliminary injunctions, Dissent, ¶ 60, he neither mentions nor applies any of the foregoing federal authority and the Dissent's review of the District Court's preliminary injunction is certainly not "limited and deferential." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1184. Under our caselaw, this Court's review of a district court's grant of a preliminary injunction is for a manifest abuse of discretion. *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 5. With these standards in mind, we turn to the preliminary injunctions issued by the District Court in this case.

¶15 Beyond the merits of the injunctions, the State takes issue with both the District Court's oral ruling and its written order. The State asserts the District Court criticized and "ignored" the revised preliminary injunction standard when issuing its oral injunction from the bench and that the court's written order, issued after the State appealed to this Court, "failed to properly consider the facts and lacked independent judgment." The Providers contend the District Court correctly applied the revised preliminary injunction standard in its oral ruling, which has, in any event, been superseded by the court's written order which "indisputably applied the correct standard." The Providers further note the State's disagreement with the court's findings crediting the Providers' experts over the State's does not demonstrate a manifest abuse of discretion, but raise only a factual dispute going to the ultimate merits of the case and is not proper for resolution on appeal from a preliminary injunction.

¶16 The Providers correctly note that the District Court's oral injunction has been superseded by the written order and is no longer before this Court. We briefly note, however, that the State is incorrect in claiming that the District Court failed to consider any of the four factors of the revised preliminary injunction test of § 27-19-201(1), MCA (2023), when orally granting the Providers' request for an injunction. While the District Court expressed its opinion the new standard "puts the [d]istrict [c]ourt judges in a difficult position" due to having to consider the likelihood of success on the merits when neither the facts nor the legal arguments have "been fully developed during the course of the litigation," it nonetheless expressly noted it was "consider[ing]" the Legislature's "recent enactment to mirror" the federal injunction standard. The District Court granted the

11

preliminary injunction after "considering the testimony, the evidence presented today and the arguments of counsel" presented at the hearing. The State also takes issue with the District Court's statement about the importance of maintaining the status quo when it orally granted the preliminary injunction requested by Providers, asserting it demonstrates the court did not consider the preliminary injunction standard of § 27-19-201(1), MCA. As noted, the court did consider the revised standard. And, in any event, the District Court's belief regarding the importance of maintaining the status quo is correct. In the federal courts, which have been interpreting the *Winter* test for several years, it remains the case that "the purpose of a preliminary injunction is to 'preserve the status quo and the rights of the parties until a final judgment issues in the cause.'" *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 789 (9th Cir. 2019) (quoting *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).[2]

¶17 The State next asserts that the District Court adopting the Providers' proposed order when issuing its written order in this case demonstrates a lack of independent judgment and the injunctions should be reversed on that basis. "While we discourage a district court's verbatim adoption of a prevailing party's proposed order, such an action is not *per se* error. A district court may adopt a party's proposed order where it is sufficiently comprehensive and pertinent to the issues to provide a basis for the decision." *Wurl v. Polson Sch. Dist. No. 23*, 2006 MT 8, ¶ 29, 330 Mont. 282, 127 P.3d 436 (citing *In re M.W.*, 2004 MT 301, ¶ 28, 323 Mont. 433, 102 P.3d 6) (internal citation omitted);

---

[2] The Dissent also ignores this line of federal precedent and does not even mention the term "status quo."

*see also In re Marriage of Frank*, 2022 MT 179, ¶ 84, 410 Mont. 73, 517 P.3d 188 ("This Court has approved the verbatim adoption of findings and conclusions where they are comprehensive and detailed and supported by the evidence."). "The litmus test is whether a district court's order sets forth reasoning, based upon its findings of fact and conclusions of law, in a manner sufficient to allow informed appellate review." *Snavely v. St. John*, 2006 MT 175, ¶ 11, 333 Mont. 16, 140 P.3d 492 (citing *Shammel v. Canyon Res. Corp.*, 2003 MT 372, ¶ 28, 319 Mont. 132, 82 P.3d 912). In reviewing the findings and conclusions of a district court, our concern is "'the result and not the source[.]'" *In re Marriage of Frank*, ¶ 86 (quoting *In re Marriage of Jensen*, 193 Mont. 247, 252, 631 P.2d 700, 703 (1981)). "[T]here is no reason in the Rules or otherwise to give such adopted findings a lesser degree of weight, since once signed by the district judge they bear the imprimatur of the court." *In re Marriage of Jensen*, 193 Mont. at 253, 631 P.2d at 703-04. Our review of the District Court's order in this case shows that the order is "sufficiently comprehensive to provide a basis for its decision and for our review on appeal," *Wurl*, ¶ 29, and we turn now to addressing the substance of the court's order.

***Likelihood of Success on the Merits***

¶18    The first prong of the preliminary injunction test is whether "the applicant is likely to succeed on the merits[.]" Section 27-19-201(1)(a), MCA. "[L]ikelihood of success does not require the applicant to establish entitlement to final judgment, relief at all events on final hearing, relief at a trial on the merits, or evidence sufficient to prevail at trial." *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 30 (cleaned up, collecting cases). The State asserts the Providers are not likely to succeed on the merits because the District Court

improperly applied strict scrutiny, the Providers lack standing, and neither HB 544 nor HB 862 violate the right to privacy or equal protection of the laws, particularly when reviewed under a rational basis test. The Providers contend they are likely to succeed on the merits because both bills infringe the right to privacy and are thus subject to strict scrutiny review, under which the State failed to demonstrate the bills are narrowly tailored to prevent a medically acknowledged, bona fide health risk.

¶19 We begin with the State's argument the Providers lack standing to bring this case. The State contends Providers cannot "demonstrate sufficient third-party standing" to bring claims on behalf of their patients. The State asserts neither the bills nor the Rule at issue here impact the constitutional rights of women patients and therefore do not implicate decades of our own precedent which has consistently held that "health care providers have standing to assert on behalf of their women patients the individual privacy rights under Montana's Constitution of such women to obtain a pre-viability abortion from a health care provider of their choosing." *Armstrong v. State*, 1999 MT 261, ¶ 13, 296 Mont. 361, 989 P.2d 364; *see also Weems I*, ¶ 12 ("[W]hen 'governmental regulation directed at health care providers impacts the constitutional rights of women patients,' the providers have standing to challenge the alleged infringement of such rights."). The State asserts our precedent allowing abortion providers to sue on behalf of their patients is not applicable here and the Providers must instead meet a traditional third-party standing analysis, such as that recognized in *Baxter Homeowners Ass'n v. Angel*, 2013 MT 83, ¶ 15, 369 Mont. 398, 298 P.3d 1145, wherein the Providers must demonstrate both a close relationship with their patients and the existence of some hindrance to their patients' ability to bring suit in order

14

to have standing. The District Court rejected the State's argument in this regard and found the governmental regulations at issue "impact the constitutionally protected rights of Plaintiffs' Medicaid patients by making it much more difficult, if not impossible, for them to access abortion." We agree with the District Court. The Providers allege the provisions at issue here directly impact both the Montana Constitution's right to privacy and its right to equal protection of the laws by "infring[ing] on the right of Providers' Medicaid patients to access abortion," noting the provisions "would deny abortion access to most Medicaid-eligible Montanans." These considerations implicate our abortion provider third-party standing precedent as first set forth in *Armstrong* and continuously reaffirmed in the years since, and we "have little trouble concluding . . . that [Providers] have standing to bring their complaint" challenging the provisions at issue here because they "impact[] the constitutional rights of women patients" and are "directed at health care providers[.]" *Weems I*, ¶ 12 (citations omitted).

*Application of Strict Scrutiny*

¶20 Beyond its standing argument, the State further contends Providers are unlikely to succeed on the constitutional merits of their claims. At the outset, the State asserts the District Court erred by applying strict scrutiny when reviewing the challenged provisions and the provisions survive rational basis review. The Providers assert strict scrutiny review is required because the challenged provisions "implicate Providers' patients' rights to access abortions[.]" The District Court applied strict scrutiny review to both the privacy and equal protection claims.

¶21 "[I]n our review of a preliminary injunction, we may review whether the district court applied the proper level of judicial scrutiny to enjoin an allegedly unconstitutional statute." *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 13, 366 Mont. 224, 286 P.3d 1161 (*MCIA*). "Montana adheres to one of the most stringent protections of its citizens' right to privacy in the United States--exceeding even that provided by the federal constitution. Indeed, since the right of privacy is explicit in the Declaration of Rights of Montana's Constitution, it is a fundamental right." *Armstrong*, ¶ 34 (internal citation omitted). "Independently of the federal constitution, when the right of individual privacy is implicated, Montana's Constitution affords significantly broader protection than the federal constitution." *Weems v. State*, 2023 MT 82, ¶ 35, 412 Mont. 132, 529 P.3d 798 (*Weems II*). In accordance with the significantly broader protection provided by the Montana Constitution, we have long "recognized that 'legislation infringing the exercise of the right of privacy must be reviewed under a strict-scrutiny analysis,' which necessarily shifts the burden to the State to demonstrate that the legislation is 'justified by a compelling state interest and [is] narrowly tailored to effectuate only that compelling interest.'" *Weems II*, ¶ 34 (quoting *Armstrong*, ¶ 34). If a provision infringes on the Montana Constitution's right to privacy, it is subject to strict scrutiny review. *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20. Statutes are presumed to be constitutional and the party challenging the constitutionality generally bears the burden of proving the statute unconstitutional. *Molnar v. Fox*, 2013 MT 132, ¶ 49, 370 Mont. 238, 301 P.3d 824 (citations omitted). "While the analysis of a statute pertaining to fundamental rights will generally require a strict scrutiny review that ultimately shifts the burden, we still begin

16

our review with the same principle: statutes are presumed to be constitutional." *Weems II*, ¶ 34. The District Court applied strict scrutiny to the provisions because it determined they interfere with the abortion provider-patient relationship by singling out abortion care for disparate treatment.

¶22 The State's assertion the provisions at issue in this case are simple funding issues and do not so much as implicate the Montana Constitution's right to privacy, which this Court has long held "protects a woman's right of procreative autonomy--here, the right to seek and to obtain a specific lawful medical procedure, a pre-viability abortion, from a health care provider of her choice," *Armstrong*, ¶ 75, is not persuasive. The provisions at issue here, as they relate to Medicaid-eligible patients, would bar Medicaid from covering abortion services provided by a provider other than a physician, even though this Court has recently reaffirmed that the judgment of who is qualified to provide an abortion is the medical community's, not the Legislature's, to make, *see Weems II*, ¶ 51; require abortion services to undergo a prior authorization process, which would both impose a delay in the time-sensitive procedure and require a patient to make an in-person visit to a medical center when medication abortions have "safely been done via telehealth for years," *see Planned Parenthood of Mont. v. State ex rel. Knudsen*, 2024 MT 227, ¶ 25, ___ Mont. ___, ___ P.3d ___; and provide an abortion-specific definition of when an abortion is "medically necessary" which is untethered from both the definition applicable to every other medical service provided under Medicaid and from the medical judgment of a patient's own doctor. HB 862 goes even farther than HB 544 and the Rule, and completely prohibits the use of public funds for abortion services unless the pregnancy is "the result of an act of rape or

17

incest" or would place the patient "in danger of death," again untethering the act of abortion from the medical judgment of the patient's own doctor and violating the personal autonomy guarantees of the Montana Constitution. Though the State protests, the District Court found preliminarily that these provisions are more than just funding judgments—they implicate the constitutional rights of Medicaid-eligible Montanans. The court noted the First Judicial District Court's ruling that the state may not inject coercive financial incentives favoring childbirth into a decision which is constitutionally guaranteed to be free from governmental intrusion, *Jeannette R. v. Ellery*, No. BDV-94-811, 1995 Mont. Dist. LEXIS 795, *23 (1st Jud. Dist. May 22, 1995) (citation omitted), because once the state "has entered an area that is covered by the zone of privacy," such as the constitutional right to a pre-viability abortion, "the state must be neutral." *Jeannette R.*, 1995 Mont. Dist. LEXIS 795 at *25.[3]

¶23    Here, the District Court

> applied our precedent subjecting restrictions on abortion services to strict scrutiny because they interfere with the fundamental right to privacy. *See Armstrong*[, ¶¶ 39-40]. Concluding that Montana's constitutional right to privacy "broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from government interference[,]" we held in *Armstrong* that "Article II, Section 10, protects the right to procreative autonomy[.]" *Armstrong*, ¶¶ 2, 14. *Armstrong* also held that any legislation that interferes with this right must be narrowly tailored to effectuate a compelling interest—"a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated." *Armstrong*, ¶¶ 34, 62.

---

[3] The Dissent's description of *Jeannette R.*, a 29-year-old district court decision which the State had full opportunity to appeal but did not, as a court "intend[ing] to derail the proper workings of our democratic system," Dissent, ¶ 66, serves little purpose beyond fear mongering. Montana's democratic system has not collapsed in the nearly thirty years following the First Judicial District Court's *Jeannette R.* decision.

18

*Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20. "Because the District Court found the challenged laws restrict access to abortion services, it applied strict scrutiny under *Armstrong*. The court followed our precedent and did not commit an error of law when it employed this standard." *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20; *cf. Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 484, 140 S. Ct. 2246, 2260 (2020) (determining strict scrutiny to be the appropriate level of review "[w]hen otherwise eligible recipients are disqualified from a public benefit" solely because of their religious character in violation of the U.S. Constitution's free exercise clause). Here, otherwise eligible recipients would be disqualified or otherwise restricted from certain public healthcare benefits based on their exercise of their fundamental right to privacy as guaranteed under the Montana Constitution. The District Court also determined strict scrutiny applied to the equal protection claims. Strict scrutiny applies to an equal protection challenge "when a law affects a suspect class or threatens a fundamental right. Under this standard, the State has the burden of showing the law is narrowly tailored to serve a compelling government interest." *Reesor v. Mont. State Fund*, 2004 MT 370, ¶ 13, 325 Mont. 1, 103 P.3d 1019. Again, because the court found the challenged provisions "infringe on Montanans' fundamental right to access pre-viability abortions," it properly applied strict scrutiny to the equal protection claims as well. We also apply strict scrutiny to our review of the provisions at issue in this case.

¶24 Justice Rice's Dissent proffers that rational basis review should be applied to the challenged statutes (and administrative rule) because he believes the bills "are not

restrictions upon medical procedures," but only "concern the separate issue of government healthcare funding[.]" Dissent, ¶ 59. This contention is belied by the actual text of the bills at issue—text conveniently ignored in Justice Rice's Dissent. *See* Dissent, ¶ 62 (describing HB 862 as limiting public funding "to particular kinds of abortion services" and HB 544 and the Rule as imposing a condition "that an abortion procedure be provided by certain providers, upon prior authorization, and in cases where abortions are medically necessary, as statutorily defined"). The actual provisions of HB 544 and the Rule would bar Medicaid from covering abortion services provided by a provider other than a physician, even though this Court has recently reaffirmed that the judgment of who is qualified to provide an abortion is the medical community's, not the Legislature's, to make, *see Weems II*, ¶ 51; require abortion services to undergo a prior authorization process, which would both impose a delay in the time-sensitive procedure and require a patient to make an in-person visit to a medical center when medication abortions have safely been done via telehealth for years, *see Planned Parenthood of Mont.*, 2024 MT 227, ¶ 25; and provide an abortion-specific definition of when an abortion is "medically necessary" which is untethered from both the definition applicable to every other medical service provided under Medicaid and from the medical judgment of a patient's own doctor. HB 862, meanwhile, eliminates funding for any abortion which is not a result of rape or incest, unless the pregnant woman seeking a medically necessary abortion is literally going to die. As explained above, the bills (and the Rule) challenged here are not simple funding decisions, they implicate the constitutional rights of Medicaid-eligible Montanans. "While the State retains wide latitude to decide the manner in which it will allocate benefits, it may

20

not use criteria which discriminatorily burden the exercise of a fundamental right." *Moe v. Sec'y of Admin. & Fin.*, 417 N.E.2d 387, 401 (Mass. 1981). Strict scrutiny is appropriate "where the government, by selectively denying a benefit to those who exercise a constitutional right, effectively deters the exercise of that right." *State v. Planned Parenthood of Alaska*, 28 P.3d 904, 909 (Alaska 2001). "Disparate restrictions on government funding for women based on their choice of either abortion or childbirth deter the exercise of a fundamental right because pregnant women in that position are locked in a binary dilemma: the rejection of one option inevitably entails the embrace of the other . . . biological reality requires that a woman who cannot afford a medical abortion must carry her pregnancy to term." *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 1003 (Alaska 2019). In accordance with these principles, the District Court correctly applied strict scrutiny to the challenged provisions in this case.

*Right to Privacy*

¶25    HB 544 and the Rule each bar Medicaid from covering abortion services provided by a provider other than a physician, excluding APCs; require abortion services to undergo a prior authorization process; and provide an abortion-specific definition of when an abortion is "medically necessary[.]" HB 862 prohibits the use of public funds for abortion services unless the pregnancy is "the result of an act of rape or incest" or would place the patient "in danger of death[.]" The State asserts these are simply funding measures and do not infringe on fundamental rights of Medicaid patients. The Providers assert the District Court correctly held the provisions likely violate the right to privacy by infringing the right to access abortion without addressing a medically acknowledged, bona fide health risk.

21

¶26 Under a strict scrutiny analysis of a provision alleged to infringe on a patient's fundamental right to abortion care in Montana, the State must demonstrate the provision is "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62). "A narrowly tailored law is 'the least onerous path that can be taken to achieve the state objective.'" *Weems II*, ¶ 44 (quoting *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1174 (1996)).

¶27 The State does not contend any of the provisions could survive strict scrutiny review, asserting only that the provisions "survive rational basis review and are therefore constitutional." But, as we have explained, the provisions are subject to strict scrutiny review as they implicate the fundamental rights of Medicaid-eligible Montanans. Though the State has provided no analysis under strict scrutiny, we nevertheless conduct our own review of the provisions under strict scrutiny. We do note, however, that "we are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend support to his position." *McCulley v. Am. Land Title Co.*, 2013 MT 89, ¶ 20, 369 Mont. 433, 300 P.3d 679 (citing *Botz v. Bridger Canyon Plan. & Zoning Comm'n*, 2012 MT 262, ¶ 46, 367 Mont. 47, 289 P.3d 180).

¶28 "In narrowly defined instances the state, by clear and convincing evidence, may demonstrate a compelling interest in and obligation to legislate or regulate to preserve the safety, health and welfare of a particular class of patients or the general public from a medically-acknowledged, [bona fide] health risk." *Armstrong*, ¶ 59. The District Court

did not manifestly abuse its discretion when it determined that, at this stage, the State has failed to meet its burden to demonstrate the provisions are narrowly tailored to effectuate the compelling interest of a medically acknowledged, bona fide health risk and, based upon the evidence presented, that the Providers have shown they are likely to succeed on the merits. The State contends its compelling interest is in combatting Medicaid fraud by abortion providers, but the District Court found the State presented no evidence abortion providers were engaged in Medicaid fraud or ever filled out the required MA-37 Form incorrectly. The State contends the physician-only requirement is justified by Medicaid's interest in "ensuring that professionals performing abortions for its beneficiaries have the skills necessary to provide a high level of care," but this Court has consistently determined the determination of who has the skills to provide abortions is determined by the medical community. "[E]xcept in the face of a medically-acknowledged, [bona fide] health risk, clearly and convincingly demonstrated, the legislature has no interest, much less a compelling one, to justify its interference with an individual's fundamental privacy right to obtain a particular lawful medical procedure from a health care provider that has been determined by the medical community to be competent to provide that service and who has been licensed to do so." *Armstrong*, ¶ 62; *see also Weems II*, ¶ 51. The State contends the prior authorization process does not violate the right to privacy because the in-person examination can be done at any medical facility, but the process undoubtedly requires an extra in-person visit to a healthcare provider, imposes a waiting period to receive the authorization, and would in practice ban direct-to-patient medication abortions which have safely been done via telehealth for years without the need for any in-person visit. *Planned*

23

*Parenthood of Mont.*, 2024 MT 227, ¶ 25. And, as for the abortion-specific "medically necessary" definition imposed by the Rule and HB 544, as succinctly stated by the District Court, the "State cannot circumvent *Jeannette R.*'s requirement that it cover medically necessary abortions by restricting the category of abortions classified as medically necessary" as this would supplant the clinical judgment of the actual providers as to what constitutes medical necessity. HB 862's ban on Medicaid for all abortions except in the case of rape, incest, or threat of death certainly is not narrowly tailored to effectuate the compelling interest of a medically acknowledged, bona fide health risk to Medicaid-eligible Montana women because "abortion care is one of the safest forms of medical care in this country and the world[.]" *Weems II*, ¶ 46. At this stage in the litigation, the State has not clearly and convincingly demonstrated the provisions at issue are "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62). While the State takes issue with the District Court crediting some of the testimony of the Providers' experts over that of the State's experts, such a credibility determination is entirely within the province of the District Court to make. *See In re T.N.-S.*, 2015 MT 117, ¶ 24, 379 Mont. 60, 347 P.3d 1263. And such testimony remains subject to full development and evaluation in the merits proceeding. Under a strict scrutiny analysis, the Providers are likely to succeed on their claim the provisions at issue are unconstitutional infringements on the right to privacy.

24

*Equal Protection*

¶29  The District Court found the Rule, HB 544, and HB 862 also violate the Montana Constitution's guarantee of equal protection. "No person shall be denied the equal protection of the laws." Mont. Const. art. II, § 4. "Article II, Section 4, of the Montana Constitution provides even more individual protection than does the Fourteenth Amendment to the U.S. Constitution." *A.J.B. v. Mont. Eighteenth Jud. Dist. Ct.*, 2023 MT 7, ¶ 24, 411 Mont. 201, 523 P.3d 519. "Equal protection guarantees that persons similarly situated with respect to a legitimate government purpose of a law receive like treatment." *A.J.B.*, ¶ 25 (citing *Rausch v. State Comp. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192).

¶30  We evaluate "potential equal protection violations under a three-step process: (1) we identify the classes involved and determine if they are similarly situated; (2) we determine the appropriate level of scrutiny to apply to the challenged statute; and (3) we apply the appropriate level of scrutiny to the statute." *A.J.B.*, ¶ 25 (citing *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, ¶¶ 15, 17-18, 353 Mont. 265, 222 P.3d 566). "A law or policy that contains an apparently neutral classification may violate equal protection if 'in reality [it] constitutes a device designed to impose different burdens on different classes of persons.'" *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 16, 325 Mont. 148, 104 P.3d 445 (quoting *State v. Spina*, 1999 MT 113, ¶ 85, 294 Mont. 367, 982 P.2d 421).

¶31  The District Court found the provisions treated similarly-situated classes differently by imposing "restrictions that will prevent pregnant Medicaid patients who decide to terminate their pregnancies from accessing those medically necessary abortions . . . without

imposing similar restrictions on medically necessary care for Medicaid patients who choose to continue their pregnancies" and applied strict scrutiny because the challenged provisions implicate a fundamental right.  As with the challenged provision from *Jeannette R.*, here the "state has taken the class of indigent pregnant Medicaid eligible women and divided them.  One class, who needs medically necessary treatment (an abortion) are not entitled to help from the state.  However, another class (those women for whom child birth is a medically necessary treatment) are entitled to state financial help." *Jeannette R.*, 1995 Mont. Dist. LEXIS 795 at *27.  Justice Rice's Dissent disagrees with our determination of the classes at issue here, asserting the only difference between indigent women seeking Medicaid funding for an abortion and those seeking to carry a fetus to term is individual choice.  Dissent, ¶¶ 67-68.  This disagreement appears to arise due to the Dissent's refusal to engage with the actual content of the bills at issue in this case—a legislative and executively-imposed directive for what "medically necessary" means untethered from the medical judgment of providers and applied only to abortion care and no other medical services provided by Medicaid—and the Dissent's implied assertion this matter involves Medicaid funding for elective, nontherapeutic abortion care.  But this case involves Medicaid, which "pays for covered *medically necessary* services" for indigent patients.  Admin. R. M. 37.82.101(1) (2011) (emphasis added).  "The State, having established a health care program for the poor, may not selectively deny necessary care to eligible women merely because the threat to their health arises from pregnancy." *Planned Parenthood of Alaska*, 28 P.3d at 908.  Further, at a basic level, "a woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the

26

same fundamental right to reproductive choice." *Planned Parenthood of Alaska*, 28 P.3d at 913; *see also Planned Parenthood of Mont. v. State,* 2024 MT 178, ¶ 28, 417 Mont. 457, 554 P.3d 153 (explaining the proper classes with regard to the Consent Act are pregnant minors who want to obtain an abortion and pregnant minors who do not want an abortion). The proper comparison classes are Medicaid-eligible women who seek funding for abortion and Medicaid-eligible women who seek funding for natal and prenatal care. *See Planned Parenthood of the Great Nw.*, 436 P.3d at 1001. Once again, the State only asserts the challenged provisions survive rational basis scrutiny and does not contend the legislation is "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62).

¶32 The Dissent further asserts, without evidence, our decision today somehow means "the government cannot provide assistance or support to women choosing to give birth without violating the equal protection clause of the Constitution[.]" Dissent, ¶ 68. This assertion is, on its face, inaccurate. None of HB 862, HB 544, or the Rule have anything to do with the State's funding of prenatal care or other pregnancy-related services—each targets only abortion care. Indeed, an indigent woman seeking to carry her pregnancy to term may also not be discriminated against once the State has established a health care program for the poor. "The State's undisputed interest in providing health care to women who carry pregnancies to term has no effect on the State's interest in providing medical care to Medicaid-eligible women who, for health reasons, require abortions." *Planned Parenthood of Alaska*, 28 P.3d at 913. And the Dissent's unusual digression into the need

27

for indigent women to be forced to carry their pregnancy to term to replace humans who die due to war and disease, Dissent, ¶ 70, or to ensure colleges are not forced to close due to a lack of students, Dissent, ¶ 71, is not only speculative, it has nothing to do with the constitutionality of HB 544, HB 862, or the Rule. Suffice it to say that our decision today does not prevent the government from "be[ing] permitted to assist and support" women who seek to carry their pregnancy to term as alleged by the Dissent. Dissent, ¶ 71. It merely recognizes the simple fact that "the State burdens the exercise of a fundamental right for indigent people when it only subsidizes the inevitable alternative." *Planned Parenthood of the Great Nw.*, 436 P.3d at 1002. "Our holding is not that the State is under a constitutional obligation to fund all abortions. Rather, we hold that the State may not jeopardize the health and privacy of poor women by excluding medically necessary abortions from a system providing all other medically necessary care for the indigent. A woman's right to choose to protect her health by terminating her pregnancy outweighs the State's asserted interest in protecting a potential life at the expense of her health." *Right to Choose v. Byrne*, 450 A.2d 925, 937 (N.J. 1982).

¶33 Specific to the Rule and HB 544, the District Court additionally found those provisions "violate equal protection by discriminating against pregnant Medicaid patients seeking an abortion from an APC" because "Medicaid would cover abortions for pregnant Medicaid patients who seek an abortion from a physician but not for pregnant Medicaid patients who seek an abortion from an APC." On appeal, the State defends the physician-only provision of the Rule and HB 544 as it relates to privacy, asserting only that the "physician requirement does not violate a woman's right to privacy" and leaving equal

28

protection unmentioned. As the physician requirement of the Rule and HB 544 relates to equal protection, then, the State has waived any claim the District Court's holding was incorrect. *See Barrett v. State*, 2024 MT 86, ¶ 42, 416 Mont. 226, 547 P.3d 630.

¶34 Regarding HB 862, the State asserts the Providers are unlikely to succeed on the merits because it "constitutes a Montana counterpart of the federal Hyde Amendment, which has withstood court scrutiny." The State asserts "HB 862 is no more restrictive than the federal Hyde Amendment, and therefore does not violate the right to privacy or equal protection." The federal Hyde Amendment, which prohibits most federal funding of abortions, was upheld by the U.S. Supreme Court in *Harris v. McRae*, 448 U.S. 297, 100 S. Ct. 2671 (1980). That Court did not apply strict scrutiny to the Hyde Amendment in analyzing the claim under the U.S. Constitution, but a form of rational basis review to determine if "the Hyde Amendment bears a rational relationship" to the government's interest in protecting the potential life of a fetus. *Harris*, 448 U.S. at 324, 100 S. Ct. at 2692. But as we have explained, "Montana's Constitution affords significantly broader protection than the federal constitution," *Weems II*, ¶ 35, "restrictions on abortion services" are subject to strict scrutiny, *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20, and the State may not "infringe the right of procreative autonomy in favor of birth[.]" *Armstrong*, ¶ 49.

¶35 Upon our review of the record, we conclude the Providers have demonstrated they are likely to succeed on the merits of their claims based upon the evidence presented thus far. At a minimum, they have presented "serious questions" going to the merits. *All. for the Wild Rockies*, 632 F.3d at 1134. The challenged provisions present legislative (or, in

the case of the Rule, executive) directives directly infringing on the right to privacy, to equal protection of the laws, and to a pre-viability abortion and none addresses a medically acknowledged, bona fide health risk. The District Court properly applied strict scrutiny and there is no manifest abuse of discretion in the District Court's determination the Providers are likely to succeed on the merits as to the unconstitutionality of the challenged provisions.

***Likelihood of Irreparable Harm***

¶36 The second prong of the preliminary injunction test concerns whether "the applicant is likely to suffer irreparable harm in the absence of preliminary relief[.]" Section 27-19-201(1)(b), MCA. "For the purposes of a preliminary injunction, the loss of a constitutional right constitutes an irreparable injury." *Driscoll*, ¶ 15; *see also MCIA*, ¶ 15. A privacy violation is "commonly recognize[d] . . . as causing irreparable injur[y]." *Weems I*, ¶ 25.

¶37 The Ninth Circuit, among others, employs a sliding scale test for preliminary injunctions. *All. for the Wild Rockies*, 632 F.3d at 1134. In *Disney Enters.*, the Ninth Circuit determined the likelihood of success on the merits to be "the most important" factor in the conjunctive preliminary injunction test. *Disney Enters.*, 869 F.3d at 856. While the Ninth Circuit is not alone in that determination, *see Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024) (describing likelihood of success on the merits to be "generally the most important" factor in preliminary injunction analysis), that view is not uniform across the federal judiciary. In the Second Circuit, for example, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a

30

preliminary injunction." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (internal quotation marks and citations omitted); *see also Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, ¶ 15, 418 Mont. 78, ___ P.3d ___ ("'Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted, the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.' 11A Wright, Miller, & Kane, *Federal Practice and Procedure*, § 2948.1 (2013)."). The Second Circuit holds irreparable harm is the most important factor "because a preliminary injunction strives to maintain the status quo in order 'to protect [the] plaintiff from irreparable injury' while awaiting final decision on the merits." *JTH Tax*, 62 F.4th at 672 (quoting Wright & Miller § 2947). In the Seventh Circuit, meanwhile, the likelihood of success on the merits and irreparable harm factors have been collectively referred to as "[t]he two most important considerations" of the preliminary injunction test. *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023). Regardless of how the various Circuit Courts of Appeal may choose to rank the *Winter* factors, one throughline remains true in each court: the purpose of a preliminary injunction generally remains to preserve the status quo and prevent irreparable injury until such time as a final judgment may be issued. *City & Cnty. of S.F.*, 944 F.3d at 789; *JTH Tax*, 62 F.4th at 672.

¶38 We have determined the Providers are likely to succeed on their constitutional claims relating to the challenged provisions—those claims being violations of the Montana Constitution's right to privacy and right to equal protection of the law. In itself, the loss of that constitutional right is an irreparable injury "for the purpose of determining whether a

preliminary injunction should be issued." *MCIA*, ¶ 15 (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689-90 (1976)). Accordingly, there is no manifest abuse of discretion in the District Court's determination the Rule, HB 544, and HB 862 are likely to cause irreparable harm in the absence of a preliminary injunction.

### *Balance of Equities and Public Interest*

¶39 The third prong of the preliminary injunction test is whether "the balance of equities tips in the applicant's favor," § 27-19-201(1)(c), MCA, while the final prong of the preliminary injunction test is whether "the order is in the public interest." Section 27-19-201(1)(d), MCA. When the government opposes a preliminary injunction, these two factors "merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

¶40 The State asserts these factors weigh in its favor because it "has the constitutional concern that the laws be faithfully executed" and to impose conditions on the payment of Medicaid services so as "to help ensure that the services are high quality." At this stage, these concerns have not been shown to be "narrowly tailored to effectuate a compelling interest—'a medically acknowledged, [bona fide] health risk, clearly and convincingly demonstrated.'" *Planned Parenthood of Mont.*, 2022 MT 157, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62). "[T]he Montana Constitution guarantees a fundamental right to access abortion care from a qualified health care provider of a woman's choice." *Weems II*, ¶ 43 (citing *Armstrong*, ¶ 75; *Weems I*, ¶ 26). As addressed in the likelihood of success prong, the District Court did not abuse its discretion in finding the challenged provisions are likely to infringe that fundamental right. "A plaintiff's likelihood of success on the merits of a

32

constitutional claim . . . tips the merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).[4] The balance of the equities therefore tips in the Providers' favor because "the government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017) (internal quotation marks omitted). The preliminary injunction is also in the public interest because "it is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citations omitted), and "all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

¶41     There is no manifest abuse of discretion in the District Court's determination the balance of the equities tips in the Providers' favor because the government suffers no harm from an injunction which merely ends unconstitutional practices and that a preliminary injunction enjoining the provisions at issue in this case is in the public interest because it is always in the public interest to prevent a violation of a party's constitutional rights. As such, the Providers have met all four prongs of the preliminary injunction test and the District Court did not manifestly abuse its discretion by granting their request for a preliminary injunction.

---

[4] Under the federal preliminary injunction test, "in cases where a plaintiff alleges a constitutional injury, it is no surprise that 'our caselaw clearly favors granting preliminary injunctions to a plaintiff . . . who is likely to succeed on the merits of his [constitutional] claim.'" *Baird*, 81 F.4th at 1042 (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009)).

## CONCLUSION

¶42 In sum, our review of the record in this case shows the District Court did not manifestly abuse its discretion by issuing a preliminary injunction enjoining the Rule, HB 544, and HB 862, because the Providers are likely to succeed on the merits, would be irreparably harmed absent an injunction, the balance of the equities tips in the Providers' favor, and the injunction is in the public interest. The case will proceed to trial and await the District Court's decision on the ultimate merits of the Providers' claims. *See Planned Parenthood of Mont.*, 2022 MT 157, ¶ 61.

¶43 Affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR

Justice Laurie McKinnon concurring.

¶44 I concur with the Court's decision in its entirety. I write separately to address only the Special Concurrence and Dissent.

¶45 To begin, the Special Concurrence faults the Court for "stray[ing] beyond what is necessary to decide the preliminary injunction appeal and . . . effectively decid[ing] the case on its merits in review of an interlocutory order." Special Concurrence, ¶ 54. The Special Concurrence agrees with the Court on the privacy claim and does not contend the Court impermissibly reached the merits on that claim in an interlocutory order; yet the

Court applied the same analysis and preliminary injunction criteria to the equal protection claim as it did to the privacy claim.[1]  The Special Concurrence would simply apply "our long-established precedent in affirming the District Court's application of strict scrutiny to a review of the Providers' privacy claims."  Special Concurrence, ¶ 56.  However, the Court was required by statute to examine *each* of the preliminary injunction factors—two of which required likelihood of success and irreparable injury.  Here, Providers' claims allege both a violation of the right to privacy *and* equal protection of the law, and the District Court entered an order enjoining the statutes on each constitutional bases.  The District Court and the parties, both of whom have invested significant time and energy in these proceedings, should know whether they got the law right and their legal analysis was correct.  We recently held a statute requiring parental consent for an abortion was unconstitutional because it violated the right to privacy *and* equal protection of the law.  *Planned Parenthood v. State*, 2024 MT 178, ¶ 49, 417 Mont. 457, 554 P.3d 153.  It was important there, as it is here, to address the parties' arguments, the District Court's decision, and to apply our case law consistently.  Further, addressing a party's arguments helps develop case law, even if it only pertains to preliminary injunction proceedings.  The Special Concurrence's selective approach of which constitutional provision to address likely will send mixed messages to litigants and the courts of various justices' implied

---

[1] The Special Concurrence refers to the Court's decision as a "Plurality Opinion."  However, the Special Concurrence is mistaken as the plurality exists only with respect to the equal protection claim.  This likely will prove confusing to litigants and the courts.

biases and preferences, as well as be confusing about what grounds upon which future requests for injunctions should be premised.

¶46   Far worse, however, the Special Concurrence has unnecessarily created a plurality opinion in an area of law that needs strong leadership from this Court. The Special Concurrence agreed with this Court's decision in *Planned Parenthood* and agreed that the requirement to obtain parental consent for a minor's abortion violated the minor's right to privacy *and* equal protection of the law. That this proceeding takes place in the context of a preliminary injunction request does not call for a dilution in the applicable law and relevant precedent. The Special Concurrence, and the resulting plurality as to the equal protection claim, will cause this Court to be criticized for its inadequacy as pronouncements from a court of final resort, as guides to lower courts, and as statements of the law. This Court has a role beyond that of resolving individual disputes; we serve as a guide for private parties, legislatures, lower courts, and our own future decisions. To perform this function adequately, we must provide definitive statements of the law; more than a mere agreement on the result is needed. Without a majority rationale for the result, this Court abdicates its responsibility to the institutions and parties depending on it for direction. A plurality decision thus represents a failure to fulfill the Court's obligation.

¶47   Here, the Special Concurrence has provided nothing, other than that the Court addressed both claims ruled on by the District Court, to justify this plurality opinion. The Special Concurrence cites to an opinion I authored, *State v. Tome*, 2021 MT 229, 405 Mont. 292, 495 P.3d 54, to support its misplaced application here of judicial restraint. In *Tome*, however, I cited the doctrine of judicial restraint as a reason the United States Supreme

36

Court did not specifically overrule prior precedent when it was not necessary for its ruling. *Tome*, ¶ 31. In *Tome*, the exercise of judicial restraint did not create a plurality opinion. The Supreme Court's decision was a legitimate exercise of judicial restraint and is a far cry from here, where the exercise of "judicial restraint" by the Special Concurrence is not supported by our case law and *has* needlessly created a plurality opinion. Unlike other decisions of this Court, plurality decisions are open to criticism purely because of their form; they are a body of cases exhibiting judicial decision-making at its worst. The Court has addressed the claims made by the parties and did not cherry-pick which argument it would entertain. Both the right to privacy and equal protection are weighty constitutional issues in our precedent and are relevant to and frequently arise in preliminary injunction proceedings. The Special Concurrence does a disservice to the parties and courts.

¶48    I now turn to the Dissent. The Dissent recognizes authority on preliminary injunction standards from the Eighth and First federal Circuits. This Court has not yet had the opportunity to address the division within the federal Circuits on how to apply the preliminary injunction factors. The federal Circuits apply three different tests to preliminary injunction questions: the Sliding Scale test, the Sequential Test, and the Gateway Factor Test. It appears the Dissent, by recognizing the "most important factor" in its preliminary injunction analysis as the likelihood of success on the merits, is applying the Gateway Factor test. This test is a hybrid which blends the Sequential Test, used in the Fourth, Fifth, Tenth, and Eleventh Circuits and the Sliding Scale Test, used in the Second, Sixth, Seventh and Ninth Circuits. The Gateway Factor test examines the likelihood of

success and the likelihood of irreparable harm—the gateway factors—before balancing the remaining factors.

¶49 How to apply the preliminary injunction factors has not been addressed by this Court and I believe it important that we be clear going forward on what federal standard courts and litigants are to apply. Further, which test is applicable in Montana has not been raised by any of the parties. The Court's application of Ninth Circuit precedent is nonetheless appropriate and correct because, when applying the correct level of strict scrutiny, Planned Parenthood has successfully met its burden on each factor.

¶50 I additionally point out that a woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice and that any analysis under the right to privacy and the equal protection clause must be made pursuant to strict scrutiny. Planned Parenthood argues the statutes and regulations at issue here effectively deter the exercise of the fundamental right to reproductive choice by selectively denying a benefit to those who exercise that right. Hence, the issue here is not about whether the legislature has discretion to fund a particular program; it is about whether they may deter the exercise of a fundamental right when the legislature funds or does not fund medical care that affects reproductive choice.

¶51 And, finally, in response to the Dissent's position that the Legislature controls the purse and has the exclusive appropriation function within the constitutional separation of powers, Dissent ¶ 65, I feel compelled to revisit what Alexander Hamilton said in *The Federalist No. 78* in May 1788, about the constitutional separation of powers and the role of the judiciary:

Whoever attentively considers the different departments of power must perceive, that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them.  The Executive not only dispenses the honors, but holds the sword of the community.  The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated.  The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever.  It may truly be said to have neither FORCE nor WILL, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments . . . .

There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void.  No legislative act, therefore, contrary to the Constitution, can be valid.  To deny this, would be to affirm, that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers, may do not only what their powers do not authorize, but what they forbid.

If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the Constitution.  It is not otherwise to be supposed, that the Constitution could intend to enable the representatives of the people to substitute their WILL to that of their constituents.  It is far more rational to suppose, that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority.  The interpretation of the laws is the proper and peculiar province of the courts.  A constitution is, in fact, and must be regarded by the judges, as a fundamental law.  It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body.  If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought, of course, to be preferred; or, in other words, the Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.

> Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power.  It only supposes that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter rather than the former.  They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental . . . .

*The Federalist No. 78*, at 465-68 (Alexander Hamilton) (C. Rossiter ed., 1962).

¶52    The Supreme Court recently addressed these principles in *Moore v. Harper*, 600 U.S. 1, 143 S. Ct. 2065 (2023), where it explained the constitutional limitations on state legislatures despite being assigned specific constitutional authority.   When a state legislature carries out its constitutional power to prescribe rules, "the commission under which it exercises authority" is two-fold.  *Moore*, 600 U.S. at 27, 143 S. Ct. at 2084 (quoting *The Federalist No. 78*, at 467).  The legislature acts as both a law-making body created and bound by its state constitution, and as the entity assigned authority by the federal constitution.  Both constitutions restrain the legislature's exercise of power.  *Moore*, 600 U.S. at 27, 143 S. Ct. at 2084.   Here, while the Legislature may choose what programs to fund, it may not do so in a way that violates our State's Constitution.

¶53    Contrary to the Dissent's position, I cannot accept, under these guiding and foundational principles, that because the Legislature controls the purse, it may fund indiscriminately and without any accountability to our fundamental law as embodied in this State's constitution, which includes equal protection of the law and a right to privacy.

/S/ LAURIE McKINNON

Justice Beth Baker specially concurring.

¶44 I concur in the Court's decision to affirm the preliminary injunction. I agree that the District Court correctly applied strict scrutiny in its review of the challenged statutes and administrative rule and did not manifestly abuse its discretion when it held that the Providers are likely to succeed on their claim that these provisions unconstitutionally infringe the right to privacy under Montana's constitution. In my view, however, both the Plurality Opinion and the Dissent stray beyond what is necessary to decide the preliminary injunction appeal and would effectively decide the case on its ultimate merits in review of an interlocutory order.

¶45 "[I]n considering whether to issue a preliminary injunction, neither the district court nor this Court will determine the underlying merits of the case giving rise to the preliminary injunction." *Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 5 (quoting *Driscoll*, ¶ 12). We have cautioned trial courts and frequently repeated that when determining whether to grant or deny a preliminary injunction, findings and conclusions regarding the resolution of the ultimate issues must be reserved for trial on the merits. *See Sandrock*, ¶ 13; *Benefis Healthcare v. Great Falls Clinic, LLP*, 2006 MT 254, ¶ 19, 334 Mont. 86, 146 P.3d 714. Likewise, "[o]ur task is not to resolve the substantive matters of law relevant to the ultimate resolution of [the] complaint by the District Court; it is to inquire whether the District Court manifestly abused its discretion by denying [or granting the] motion for a preliminary injunction." *Benefis Healthcare*, ¶ 19.

¶46 By explicitly prohibiting the infringement of individual privacy "without the showing of a compelling state interest," Article II, Section 10, of the Montana Constitution

41

compels strict scrutiny analysis. The Court applies our long-established precedent in affirming the District Court's application of strict scrutiny to a review of the Providers' privacy claims. Applying that standard, I agree with and join the Court's analysis of the privacy claims in affirming the preliminary injunction.

¶47 I would end the analysis there. When a district court is faced with a request for preliminary injunction, it "should restrict itself to determining whether the applicant has made a sufficient case to warrant preserving a right in status quo until a trial on the merits can be had." *Knudson v. McDunn*, 271 Mont. 61, 65, 894 P.2d 295, 298 (1995) (citing *Porter v. K & S P'ship*, 192 Mont. 175, 181, 627 P.2d 836, 839 (1981)). In like fashion, this Court should restrict itself to determining whether the trial court had a legitimate basis for granting relief. "[I]n Montana we have a long line of cases holding that constitutional questions will not be determined unless their determination is essential to the disposition of the case." *State ex rel. Hammond v. Hager*, 160 Mont. 391, 400, 503 P.2d 52, 57 (1972) (citations omitted). *See also In re G.M.*, 2008 MT 200, ¶ 25, 344 Mont. 87, 186 P.3d 229 ("We have repeatedly recognized that courts should avoid constitutional issues whenever it is possible to decide a case without reaching constitutional considerations" (internal citation omitted)). This principle of restraint should have equal force in resolving appeals of a preliminary injunction on the narrowest ground supported by the record and the trial court's decision so as to avoid adjudicating the case on its merits at this preliminary stage. "The 'cardinal principle of judicial restraint' is that 'if it is not necessary to decide more, it is necessary not to decide more.'" *State v. Tome*, 2021 MT 229, ¶ 31, 405 Mont. 292, 495 P.3d 54 (quoting *Morse v. Frederick*, 551 U.S. 393, 431,

127 S. Ct. 2618, 2641 (2007) (Breyer, J., concurring in the judgment in part and dissenting in part)).

¶48    Because the Court's privacy ruling, well-grounded in our precedent, "is sufficient to settle the case at bar, principles of judicial restraint counsel us to decline ruling further." *In re Powder River Drainage Area*, 216 Mont. 361, 376, 702 P.2d 948, 957 (1985). I accordingly join its decision to affirm the preliminary injunction on the Providers' privacy challenge; I offer no opinion or comment about the equal protection issues at this stage in the proceedings.


                                        /S/ BETH BAKER


Justice James Jeremiah Shea joins in the specially concurring Opinion of Justice Beth Baker.


                                        /S/ JAMES JEREMIAH SHEA


Justice Rice, dissenting.

¶49    The Court upholds the District Court's preliminary injunction of HB 544 and HB 862. I would reach a contrary conclusion on the critical distinction that these bills are not restrictions upon medical procedures that must rest upon a bona fide health risk and be subjected to strict scrutiny review under the fundamental right of privacy. Rather, the challenged bills concern the separate issue of government healthcare funding, an issue that lies at the core of the Legislature's exclusive appropriation function within the

constitutional separation of powers, and which should be assessed under rational basis review.

¶50 First, as the Court notes, the District Court applied the new Montana statute, adopted in March 2023, which revised the standards governing the issuance of preliminary injunctions, and adopted federal standards. *See* § 27-19-201(1), MCA.[1] Now, a petitioner must demonstrate the likelihood of success on the merits in every injunction case, in addition to demonstrating the other conjunctively listed requirements. Critically, federal courts, precedent from which we are now to follow, have recognized that likelihood of success on the merits is the "most important factor" in the preliminary injunction analysis. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018); *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011); *see also Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) ("[P]roving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction."). Consequently, issuance of a preliminary injunction in Montana is now more heavily dependent upon a court's consideration of a petitioner's likelihood of success on the merits than under prior statute.

¶51 Consideration of the merits should begin where all constitutional challenges to legislation must begin: that the legislation is presumed to be constitutional. "The constitutionality of a legislative enactment is prima facie presumed, and every intendment in its favor will be presumed, unless its unconstitutionality appears beyond a reasonable doubt. The question of constitutionality is not whether it is possible to condemn, but

---

[1] The statute was made retroactively applicable "to all occurrences on or after January 1, 2021." 2023 Mont. Laws ch. 79, § 3.

whether it is possible to uphold the legislative action . . . ." *Powell v. State Compensation Ins. Fund*, 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877 (citing *Stratemeyer v. Lincoln County*, 259 Mont. 147, 150, 855 P.2d 506, 508-09 (1993)); *see also Driscoll*, ¶ 16 (a challenged statute "enjoys a presumption of constitutionality."). This is because courts must "assume that the legislative body—whether Congress or a state legislature—was aware of constitutional limitations and endeavored to follow them." *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023); *see also Clark Fork Coalition v. Mont. Dep't of Natural Res. & Conservation*, 2021 MT 44, ¶ 60, 403 Mont. 225, 481 P.3d 198 ("The Legislature is presumed to be aware of all of its enactments, as well as all related constitutional duties and limitations."). "Every possible presumption must be indulged in favor of the constitutionality of a legislative act. . . . The party challenging a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt." *Powell*, ¶ 13. "[I]f any doubt exists, it must be resolved *in favor of the statute*." *Powell*, ¶ 13 (emphasis added). While a challenged statute need not be proven to be unconstitutional beyond a reasonable doubt at the preliminary injunction stage, a petitioner nonetheless has the burden, as part of the consideration of the likelihood of ultimate success on the merits, of making out a prima facie case that a challenged statute is unconstitutional. *See City of Billings v. County Water Dist.*, 281 Mont. 219, 227, 935 P.2d 246, 250 (1997) (petitioner for injunctive relief need not "prove beyond a reasonable doubt" that a challenged statute is unconstitutional, but nonetheless "must make out a prima facie case of unconstitutionality.").

¶52 After presuming the legislation's constitutionality, a court's assessment of likelihood of success must consider the appropriate level of scrutiny to be applied to the judiciary's review of the challenged statute. *See Mont. Cannabis Indus. Ass'n*, ¶ 13. At center in this case is the Legislature's power of the purse, including both the power to appropriate public funding and to set the conditions upon which the funds can be appropriated, that is, to adopt regulations for such funding. Specifically, HB 862 limits public funding (Medicaid) to particular kinds of abortion services, while HB 544, and the Rule adopted pursuant thereto, impose the condition for Medicaid funding that an abortion procedure be provided by certain providers, upon prior authorization, and in cases where abortions are medically necessary, as statutorily defined. These are parameters the Legislature has adopted for provision of public funding of abortion services pursuant to its power of the purse, a quintessential legislative purpose that has been long recognized:

> *Among Congress's most important authorities is its control of the purse.* U.S. Const., Art. I, § 9, cl. 7; see also *Office of Personnel Management* v. *Richmond*, 496 U. S. 414, 427, 110 S. Ct. 2465, 110 L. Ed. 2d 387 (1990) (the Appropriations Clause is "a most useful and salutary check upon profusion and extravagance" (internal quotation marks omitted)). It would be odd to think that separation of powers concerns evaporate simply because the Government is providing monetary benefits rather than imposing obligations.

*Biden v. Nebraska*, 600 U.S. 477, 505, 143 S. Ct. 2355, 2375 (2023) (emphasis added).

> *By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement.* It was uncontroversial that the powers to raise and disburse public money would reside in the Legislative Branch. The only disagreement was about whether the right to originate taxation and appropriations bills should rest in a legislative body with proportionate representation. . . .

> In short, the origins of the Appropriations Clause confirm that appropriations needed to designate particular revenues for identified purposes. Beyond that, however, early legislative bodies exercised a wide range of discretion.

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 431, 144 S. Ct. 1474, 1484 (2024) (emphasis added) (affirming the funding of consumer bureau despite Congress not employing the usual mechanism of specific appropriation).

> The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. *The judiciary, on the contrary, has no influence over either the sword or the purse*; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever.

*Evans v. Gore*, 253 U.S. 245, 249, 40 S. Ct. 550, 551 (1920) (citing Federalist No. 78, at 1 (Alexander Hamilton) (emphasis added) (overruled in part on other grounds, *United States v. Hatter*, 532 U.S. 557, 121 S. Ct. 1782 (2001)).

¶53    In *Harris*, the U.S. Supreme Court entertained statutory and constitutional challenges to congressional appropriation actions involving the "funding of abortions under Title XIX of the Social Security Act, commonly known as the 'Medicaid' Act, and recent annual Appropriations Acts containing the so-called 'Hyde Amendment,'" and addressed several issues that are likewise before us here. *Harris*, 448 U.S. at 300-01, 100 S. Ct. at 2680-81. Regarding interpretation of the challenged appropriation statutes, the Court concluded that Title XIX did not require a participating state to pay for services for which federal reimbursement was unavailable, specifically in that case, by reason of the Hyde Amendment's limitation on the funding of abortion. *Harris*, 448 U.S. at 309, 100 S. Ct. at 2684. Taking up the plaintiffs' constitutional challenges, including under the then-existent federal "due process liberty" right to abortion established in *Roe v. Wade*, 410 U.S.

47

113, 93 S. Ct. 705 (1973), the Court distinguished the constitutional right to obtain an abortion from a claimed right to require public funding for that private choice:

> Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom. To hold otherwise would mark a drastic change in our understanding of the Constitution. It cannot be that because government may not prohibit the use of contraceptives, *Griswold* v. *Connecticut*, 381 U.S. 479, or prevent parents from sending their child to a private school, *Pierce* v. *Society of Sisters*, 268 U.S. 510, government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to obtain contraceptives or send their children to private schools. To translate the limitation on governmental power implicit in the Due Process Clause into an affirmative funding obligation would require Congress to subsidize the medically necessary abortion of an indigent woman even if Congress had not enacted a Medicaid program to subsidize other medically necessary services. Nothing in the Due Process Clause supports such an extraordinary result.

*Harris*, 448 U.S. at 317-18, 100 S. Ct. at 2688-89. Rejecting the plaintiffs' privacy and equal protection arguments, the Court applied rational basis review and affirmed the Hyde Amendment appropriation provision pursuant thereto.[2] *Harris*, 448 U.S. at 324, 100 S. Ct. at 2692.

---

[2] The *Harris* Court was not unaware of the potentially impactful nature of its decision, but believed it was the correct application of the Constitution, stating:

> It is not the mission of this Court or any other to decide whether the balance of competing interests reflected in the Hyde Amendment is wise social policy. If that were our mission, not every Justice who has subscribed to the judgment of the Court today could have done so. But we cannot, in the name of the Constitution, overturn duly enacted statutes simply "because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, quoted in *Dandridge v. Williams*, 397 U.S., at 484.

*Harris*, 448 U.S. at 326, 100 S. Ct. at 2693.

¶54 Likewise, the right to obtain an abortion based upon the Montana constitutional right of privacy, which subjects medical regulations to a strict scrutiny review, does not create a concomitant constitutional right for public funding of private choice that is also subjected to strict scrutiny review. We held in *Timm v. Mont. Dep't. of Pub. Health & Hum. Servs.*, 2008 MT 126, ¶ 34, 343 Mont. 11, 184 P.3d 1994, that "there is no fundamental right to receive Medicaid benefits in Montana." While public funding of abortion or other medical services can be considered beneficial and important, nevertheless, such financial programs are appropriation decisions that must, under the Constitution, be made exclusively by the Legislature, including the adoption of eligibility criteria for that funding. "It is not unreasonable for a State to insist upon a prior showing of medical necessity to insure that its money is being spent only for authorized purposes." *Maher v. Roe*, 432 U.S. 464, 480, 97 S. Ct. 2376, 2386 (1977) (upholding a state Medicaid regulation for payment of abortion services). The Legislature imposes numerous eligibility requirements for Medicaid benefits. If the Legislature's funding decisions must be subjected to strict scrutiny review by the courts—standards that are the most difficult to satisfy—that branch's power to appropriate would be significantly undermined.

¶55 The Court applies strict scrutiny review to the challenged bills for the reason that the Montana Constitution provides broader protections than the Federal Constitution. Opinion, ¶ 34. However, while this principle is correct generally, it is correct specifically only in proper context, and is not untethered from established jurisprudence. Indeed, in many areas of constitutional law, the Montana and Federal Constitutions are aligned, either as originally intended, or as they became within the development of interpretive caselaw.

49

The Legislature's power to "command[] the purse" and to prescribe the rules by which public funding is appropriated is not narrowed under the Montana Constitution. *Evans*, 253 U.S. at 249, 40 S. Ct. at 551; *see also* Mont. Const., art. V, § 1 ("The legislative power is vested in a legislature consisting of a senate and a house of representatives.").

¶56 The Court also bases its application of strict scrutiny on *Jeannette R.*, a state district court decision that was not appealed. Opinion, ¶¶ 22, 28, 31. Beyond the jurisdictional limitation of the case, I believe the constitutional portion of the decision was wrongfully entered and should not serve as precedent. The District Court, after concluding that a challenged administrative regulation was invalid as conflicting with state statute, which resolved the entire case, nonetheless proceeded to decide two constitutional challenges to the regulation, offering:

> [T]his Court feels that this issue is of such importance that these constitutional matters must be decided by the courts of Montana at one time and not over a period of time. To do otherwise would only encourage a ping pong effect where this regulation might be changed by the legislature or by an administrative agency and come back to this Court or some other court for further review. This process could take years and would not be in the public interest.

*Jeannette R.*, *17-18. It thus appears the District Court intended to derail the proper workings of our democratic system, within which the legislative and executive branches could have responded to the statutory basis for the court's decision, by using the plaintiff's constitutional challenges to preempt future actions by the other governmental branches. Clearly, efforts by the legislative and executive branches to navigate or respond to a judicial decision should instead be recognized as the proper functioning of our tripartite system, not deemed to be a time-wasting "ping pong" match to be preempted by an excessive

50

judicial ruling. If the judiciary is to retain the moral authority to perform its constitutional duty to ensure that the legislative and executive branches stay within their respective constitutional lanes, the judiciary must likewise stay within its own lane. This requires that the judiciary permit the other branches to act within their respective spheres of authority, rather than preempting them. Consequently, in my view, only the statutory portion of the District Court's decision in *Jeannette R.* was appropriately entered.

¶57 Even so, I believe the constitutional analysis provided in *Jeannette R.* was substantively incorrect, and that the citation to it furthers what I believe was the equal protection analytical error made by the Court in *Planned Parenthood v. State*, 2024 MT 178, 417 Mont. 457, 554 P.3d 153, 2024 Mont. LEXIS 889. There, the Court held that the challenged Consent Act created two similarly situated classes of minors, those being "a class of pregnant minors who want to obtain an abortion and a class of pregnant minors who do not want an abortion." *Planned Parenthood*, ¶ 28. I disagreed with that assessment of the classes on the grounds that the Consent Act did not apply to pregnant minors who did not want to obtain an abortion, and did not itself create the two classes. *Planned Parenthood*, ¶¶ 62-63 (Rice, J., concurring). Rather, the difference between the groups resulted from individual choice, not the legislation, and the groups were not similarly situated. *Planned Parenthood*, ¶¶ 62-63 (Rice, J., concurring).

¶58 Now, the Court goes further to hold that the State cannot even incentivize a woman's choice to carry her pregnancy to term and give birth, because such an incentive would not be neutral, nondiscriminatory treatment of women who seek an abortion. Opinion, ¶ 22. That the government cannot provide assistance or support to women

choosing to give birth without violating the equal protection clause of the Constitution is, in my view, an untenable conclusion, but is the logical extension of the Court's determination in *Planned Parenthood* that these groups constitute similarly situated classes that the government is treating differently, and which requires strict scrutiny review. I continue to believe this to be an incorrect equal protection analysis. *See Harris*, 448 U.S. at 325, 100 S. Ct. at 2692 ("Congress has established incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid. These incentives bear a direct relationship to the legitimate congressional interest in protecting potential life.").

¶59　Governments, at the state and national levels, frequently incentivize personal choice, providing reasons for people to individually pursue policies the government believes are good for the state or nation. Such incentivization is ubiquitous throughout the law and includes incentives for choices that would fall within so-called "zone[s] of privacy." *Jeanette R*., \*25. For example, out of their policy belief that marriage is good for society, governments provide many incentives for people to marry.[3] These policies do not constitute discriminatory, nonneutral treatment of persons who decide not to marry,

---

[3] Marriage is recognized as a universal fundamental right. *See Universal Declaration of Human Rights* art. 16, Dec. 10, 1948, A/RES/217 (III); *International Covenant on Civil and Political Rights* art. 23, Dec. 19, 1966, 999 U.N.T.S. 171; *Charter of Fundamental Rights of the European Union* Tit. II, art. 9, Oct. 26, 2012, OJ C 326, 391-407. The benefits in law of marriage in the U.S. include, to name a few: tax benefits for joint income tax filers, estate planning benefits including inheriting a share of a spouse's estate with tax exemption, a spouse's social security benefits and enhancement of the individual's social security benefits, Medicare, disability benefits for spouses, spouse's employer-provided benefits, FMLA benefits for caring for a spouse, death benefits, consumer benefits for married couples, including with respect to insurance, and communication privileges.

because such incentives for voluntary behavior do not create similarly situated classes that are treated differently by the government. Rather, the different outcome is the result of personal choice.

¶60 Women who choose to carry their pregnancies to term and give birth provide a virtually limitless benefit to society, that of human life and human potential. While the ravages of war, disease and the like can mean that a greater number of humans will result in greater suffering, history instructs us that humanity can prevail over suffering and survive into the future if enough people continue to pursue good. For that to happen, society needs more children to become more students to become more teachers and nurses and scientists and truck drivers—all the trades and professions—to serve and preserve society into the future.

¶61 Indeed, certain nations of the world are now facing the new and unusual problem of depopulation. *See* Matthew J. Delventhal et al., *Demographic Transitions Across Time and Space* 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 29480, 2021), https://www.nber.org/papers/w29480. Childbirth rates are not high enough to sustain the future needs in these nations, and governments are responding by incentivizing higher birth rates and larger families. *See* Lily Kuo & Xueying Wang, *Can China recover from its disastrous one-child policy?* The Guardian (Mar. 2, 2019, 10:00 AM EST), https://www.theguardian.com/world/2019/mar/02/china-population-control-two-child-policy [https://perma.cc/2DED-VEAB]; Neil Howe, *Nations Labor to Raise Their Birthrates*, Forbes (Mar. 29, 2019, 11:00 AM EST), https://www.forbes.com/sites/neilhowe/2019/03/29/nations-labor-to-raise-their-birthrates/

[https://perma.cc/3F34-TKH4]. The United States is facing a limited version of this. The Great Recession of 2007-2008 resulted in a decline in childbirth rates, and will, with a certainty, bring about a significantly smaller high school graduate population around 2026. Gretchen Livingston & D'vera Cohn, *U.S. Birth Rate Decline Linked to Recession*, Pew Res. Ctr. (Apr. 6, 2010), https://www.pewresearch.org/social-trends/2010/04/06/us-birth-rate-decline-linked-to-recession/ [https://perma.cc/NN5V-ZEXV]. It is projected that many colleges, perhaps hundreds, could close or be forced to downsize because of the impending "demographic cliff." Dan Bauman, *Colleges Were Already Bracing for an 'Enrollment Cliff.' Now There Might be a Second One*. The Chronicle of Higher Ed. (Feb. 7, 2024, corrected June 7, 2024, 3:55 PM EST) https://www.chronicle.com/article/colleges-were-already-bracing-for-an-enrollment-cliff-now-there-might-be-a-second-one. Human "capital" remains a critical—the most critical—ingredient to our future. Government must be permitted to assist and support the birth choice, which does not violate the Constitution because such incentives neither create similarly situated classes nor constitute discrimination against those who, for whatever reason, are unable to make that choice.

¶62 In my view, the District Court failed to apply the presumption of constitutionality of the challenged bills; did not credit our precedent that there is no fundamental right to receive Medicaid benefits and recognize that there is no concomitant constitutional right to public funding of a private choice, thereby conflating the right of private medical choice with the policy of public funding, as recognized in *Harris*, and applying the wrong standard of review; and failed to recognize the limits of the legitimate portion of the *Jeannette R.*

decision. Notably, the appropriate portion of the *Jeannette R.* decision took pains to "emphasize that this decision does not conclude that the state of Montana must fund elective, nontherapeutic abortions," and recognized that "[t]he legislature can pass its own Hyde Amendment if it wishes." *Jeanette R.*, **28, 17. The Legislature has done so. I do not believe, for the preceding reasons and consistent with the above-cited authority, that the Plaintiffs have carried their burden to demonstrate the likelihood of success on the merits.

¶63   I would reverse the preliminary injunction.


                              /S/ JIM RICE